NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

Belknap
No. 2013-071

THE STATE OF NEW HAMPSHIRE

v.

PAUL A. COSTELLA

Argued: January 9, 2014
Opinion Issued: September 12, 2014

Joseph A. Foster, attorney general (Lisa L. Wolford, assistant attorney general, on the brief and orally), for the State.

Stephanie Hausman, senior assistant appellate defender, of Concord, on the brief and orally, for the defendant.

BASSETT, J. After a jury trial in the Superior Court (O'Neill, J.), the defendant, Paul A. Costella, was convicted on two counts of criminal threatening and one count of disorderly conduct arising out of an incident that took place at the Wal-Mart store located in Tilton. RSA 631:4 (2007 & Supp. 2013); RSA 651:6, I(f) (2007); RSA 644:2 (2007). The two criminal threatening convictions were subject to an extended term of imprisonment under RSA 651:6, I(f), the "hate crime statute." On appeal, the defendant argues that the superior court erred when it: (1) denied his motion to dismiss the hate crime

enhancement; and (2) excluded the testimony of his daughter that he was not motivated by hostility towards Judaism.  We affirm.

The jury could have found the following facts.  On November 29, 2010, the defendant brought his car to Wal-Mart for an oil change.  Jane Sylvestre, an employee in the automobile department, drove the defendant's car into the service bay.  While in the defendant's car, Sylvestre saw a photograph of the defendant and his daughter in front of a red flag with a swastika on it.  In the photograph, the defendant and his daughter were, as described by Sylvestre, "doing the heil Hitler."  Sylvestre took offense because the Nazis had killed her uncle, who had been a member of the French resistance.

After parking the car in the service bay, Sylvestre returned to the service area, where she told the defendant that she had the right to refuse service to customers with whom she was uncomfortable.  In response, the defendant asked Sylvestre if she was a Jew.  Sylvestre testified that her response was along the lines of, "[W]hat's it to you?"  The defendant told Sylvestre that not enough Jews had been killed during World War II, and that "a good Jew is a dead Jew."  He then asked her if she had seen his "Jew killing gun" in the car.  Sylvestre told the defendant that her uncle had been burned alive by the Nazis during World War II, and that her mother had been forced to watch.  The defendant responded that he hoped that Sylvestre's uncle — "that Jew bastard" — had suffered when he died.  After the exchange, the defendant repeatedly walked by Sylvestre, calling her a "gypsy Jew" and stating that the "worst thing in the world is a gypsy Jew.  They didn't kill enough Jews."

After the oil change had been completed, a second employee handed the car keys to the defendant.  As Sylvestre started to process the invoice, the defendant asked her if she had seen his gun, saying, "It's a Jew killing killer."  He also accused Sylvestre of "wreck[ing]" his car because she was "a stupid Jew that doesn't know how to drive a car."  The defendant then paid his bill.  As he was leaving, the defendant declared — to no one in particular, but audibly, and within earshot of Sylvestre — that he was "getting his gun to kill the Jew b***h behind the counter."

The defendant then walked past the second employee and asked him what he thought of Jews.  When the employee replied that Jews did not bother him, the defendant stated that "we should kill them all starting with the woman behind the counter," and referred to "why [he] keeps a gun underneath [his] front seat."

Jonathan Allard, a store manager, overheard that conversation.  Allard also had heard the defendant talk about his "Jew killing gun" as well as his threats to kill.  The defendant then started speaking to Allard, raising his voice and asking Allard whether he was Jewish.  The defendant appeared agitated.  Allard did not respond.  The defendant told Allard that he was going to kill

2

"both of you Jews," and he again stated that he had his "Jew killing gun" in the car. Allard understood that the defendant was referring to him and Sylvestre. Allard then told the defendant to leave the store and informed him that the police would be called. The defendant left the premises, and the police arrived shortly thereafter. The police investigated the incident and arrested the defendant.

The defendant was indicted for disorderly conduct and charged with two counts of criminal threatening, one count for his statements to Sylvestre, and the other for his statements to Allard. Prior to trial, the State notified the defendant that pursuant to the hate crime statute it would seek enhanced penalties on the criminal threatening charges. The hate crime statute provides, in pertinent part:

   I. A convicted person may be sentenced according to paragraph III if the jury also finds beyond a reasonable doubt that such person:

   . . .

      (f) Was substantially motivated to commit the crime because of hostility towards the victim's religion, race, creed, sexual orientation as defined in RSA 21:49, national origin or sex . . . .

RSA 651:6, I(f). In addition, RSA 651:6, III (Supp. 2013) states: "If authorized by paragraph I or II, and if written notice of the possible application of this section is given the defendant at least 21 days prior to the commencement of jury selection for his or her trial, a defendant may be sentenced to an extended term of imprisonment."

At the close of the State's case, the defendant moved to dismiss all charges, as well as the hate crime sentencing enhancement, arguing as to the latter that the "State has to prove beyond a reasonable doubt that [the defendant's] actions, if, indeed, he did them, was [sic] motivated by the victim's religion. No testimony was given that [the defendant] was told by any of the witnesses that they were, indeed, Jewish." The State countered that "the fact that a victim is a member of one of those [statutorily] protected classes is not an element of the offense." The trial court denied the defendant's motion. The jury convicted the defendant of all charges, including the two counts of enhanced criminal threatening. This appeal followed.

The defendant raises two issues on appeal. First, he argues that the evidence offered at trial was insufficient to prove that, pursuant to the hate crime statute, RSA 651:6, I(f), he was substantially motivated to commit the crime of criminal threatening because of hostility towards Sylvestre's and Allard's religion. He contends that there was no evidence that either Sylvestre or Allard is Jewish. Second, he argues that the trial court erred when it

3

excluded the testimony of his daughter that he was not motivated by hostility towards Judaism.

I. Sufficiency of the Evidence

We first address whether the evidence was sufficient to establish that the defendant was substantially motivated to commit the crime of criminal threatening because of hostility towards Sylvestre's and Allard's religion. The defendant argues that the hate crime statute requires the State to prove the victims' <u>actual</u> religion, and that the statute would not apply if the defendant were "motivated by hostility towards a religion to which he reasonably [but mistakenly] believed the victim ascribed." He contends that neither Sylvestre nor Allard told him that she or he is Jewish, and, further, that there was no evidence adduced at trial that either actually is Jewish. The State counters that it is required only to prove that the defendant was substantially motivated to commit the crime because of hostility against a protected class, <u>not</u> that the victim was actually a member of that class. Alternatively, the State argues that, even if we were to adopt the defendant's interpretation of the hate crime statute, we must nonetheless affirm the sentence enhancement on the count involving Sylvestre because the State introduced sufficient evidence to prove beyond a reasonable doubt that she is Jewish.

In order to prevail on a challenge to the sufficiency of the evidence, "a defendant must show that no rational trier of fact, viewing all of the evidence and all reasonable inferences from it in the light most favorable to the State, could have found guilt beyond a reasonable doubt." <u>State v. Noucas</u>, 165 N.H. 146, 151 (2013) (quotation omitted). Here, resolution of the sufficiency issue requires that we first engage in statutory interpretation, after which we assess the sufficiency of the evidence introduced at trial.

"The interpretation of a statute is a question of law, which we review <u>de novo</u>." <u>State v. Gagne</u>, 165 N.H. 363, 370 (2013). "In matters of statutory interpretation, we are the final arbiters of the intent of the legislature as expressed in the words of a statute considered as a whole." <u>Id</u>. "When examining the language of the statute, we ascribe the plain and ordinary meaning to the words used." <u>Id</u>. "We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include." <u>Id</u>. "We construe the Criminal Code according to the fair import of its terms and to promote justice." <u>Id</u>. (quotation and brackets omitted).

The issue before us is the meaning of the phrase "the victim's religion," as used in RSA 651:6, I(f). The defendant argues that, because the hate crime statute requires the State to prove that the defendant was substantially motivated because of hostility towards the <u>victim's religion</u>, the State is required to prove two distinct elements: first, the actual religion of the victim,

and, second, that it was hostility towards the victim's religion that substantially motivated the defendant to criminally threaten the victim. He contends that construing the statute to require only that the crimes be motivated by the defendant's perception of the victim's religion adds the word "perceived" to the statute, which the legislature did not see fit to include.

The State counters that the plain language of the hate crime statute enhances the punishment for bias-based crimes, and thus requires only that the State prove that the defendant was substantially motivated to commit the crime because of hostility towards a protected class; here, the protected class consists of members of the Jewish faith. It further argues that it is the defendant, rather than the State, who is advocating for a construction that adds words to the statute. It contends that the defendant's interpretation would require the addition of the word "actual" to the statute, and establish a requirement which the legislature did not see fit to include: that the defendant had knowledge of the victim's actual status.

We conclude that because both proffered interpretations of the statute are reasonable, the statute is ambiguous. See State v. Lathrop, 164 N.H. 468, 470 (2012). Under such circumstances, we turn to the legislative history to aid in our interpretation of the meaning of the statutory language. See id. Here, however, a review of the legislative history is unavailing. See N.H.H.R. Jour. 656-57 (1990); N.H.S. Jour. 719-20 (1990).

Nonetheless, "[w]e construe statutes to address the evil or mischief that the legislature intended to correct or remedy." Lathrop, 164 N.H. at 470. The State's interpretation of the hate crime statute — enhancing a punishment because the defendant selected a victim based on the defendant's perception of the victim's membership in the protected class — is consonant with the fundamental purpose of hate crime penalty enhancement statutes in general, and of RSA 651:6, I(f) in particular: to recognize and punish the greater harm that bias-motivated crimes inflict upon society and individual victims. As the United States Supreme Court observed in regard to the Wisconsin hate crime statute:

> [T]he Wisconsin statute singles out for enhancement bias-inspired conduct because this conduct is thought to inflict greater individual and societal harm. For example, according to the State and its amici, bias-motivated crimes are more likely to provoke retaliatory crimes, inflict distinct emotional harms on their victims, and incite community unrest. The State's desire to redress these perceived harms provides an adequate explanation for its penalty-enhancement provision over and above mere disagreement with offenders' beliefs or biases.

Wisconsin v. Mitchell, 508 U.S. 476, 487-88 (1993) (quotation and citations omitted); see also In re Joshua H., 17 Cal. Rptr. 2d 291, 299 (App. Ct. 1993) (explaining that "[t]he 'basis' for punishing violent crimes directed against members of a racial, religious, or other specified group more severely than randomly inflicted violent crimes is that such crimes inflict greater injury upon the victim and society at large and existing criminal statutes and penalties have been inadequate to stop them"). "[I]t is but reasonable that among crimes of different natures those should be most severely punished, which are the most destructive of the public safety and happiness": a category into which bias-motivated crimes fall. Mitchell, 508 U.S. at 488 (quotation omitted); see Gilbert & Marchand, Note, Splitting the Atom or Splitting Hairs—The Hate Crimes Prevention Act of 1999, 30 St. Mary's L.J. 931, 933-34 (1999) ("Hate crimes are not only injurious to the individual victim, but they also fracture a surrounding community, creating a pervasive disharmony among citizens."); Pfeiffer, Note, To Enhance or Not to Enhance: Civil Penalty Enhancement for Parents of Juvenile Hate Crime Offenders, 41 Val. U. L. Rev. 1685, 1692-93 (2007) ("In addition to its significant effects on victims, hate crime imposes even greater effects on the community. . . . [T]he surrounding community suffers increased psychological trauma similar to that suffered by victims.").

The significant community harm resulting from a hate crime flows from the defendant's bias-motivated actions, rather than the victim's actual status as a member of a protected class. See U.S. Department of Justice, Hate Crime Data Collection Guidelines and Training Manual 7, 8, 20 (Dec. 19, 2012), available at http://www.fbi.gov/about-us/cjis/ucr/data-collection-manual (defining "bias crime," including the following note: "Even if the offender was mistaken in his or her perception that the victim was a member of the group he or she was acting against, the offense is still a bias crime because the offender was motivated by bias against the group."). Society is harmed by a bias-motivated crime regardless of whether the victim is, in fact, a member of the protected class that the defendant has targeted. Indeed, in this case, the crimes committed by the defendant had a pernicious impact on the community independent of whether Sylvestre and Allard are, in fact, Jewish.

Moreover, "it is not to be presumed that the legislature would pass an act leading to an absurd result and nullifying to an appreciable extent the purpose of the statute." State v. Williams, 143 N.H. 559, 562 (1999) (quotation and brackets omitted). We note that, were we to interpret the hate crime statute to require the State to prove the victim's actual status, i.e., his or her religion, race, creed, or national origin, an absurd result could follow because every prosecution under the statute would require a trial within a trial. How would a jury determine a victim's race, creed or religion? What evidence would a jury consider in order to determine whether a victim is Jewish? Would a jury consider how often a victim attends synagogue, or whether one or both of a victim's parents were Jewish, or whether the victim's grandparents were Jewish? How would a jury determine whether a victim is a Native American, or

6

the race of a biracial victim? "We think it unlikely that [the legislature] intended that . . . courts engage in these unwieldy inquiries." <u>Mississippi ex. rel. Hood v. AU Optronics Corp.</u>, 134 S. Ct. 736, 743-44 (2014) (declining to construe diversity jurisdiction statute in such a way as to render its requirements "an administrative nightmare that Congress could not possibly have intended"). In contrast, requiring the State to prove that the defendant was motivated by his or her hostility towards a victim's perceived religion leads to a straightforward and easy-to-administer process. <u>Cf</u>. <u>id</u>.

The defendant next observes that, although the legislature in 2012 added language in RSA 21:49 (2012) that explicitly provided for enhanced sentences for crimes motivated by hostility towards a victim's <u>perceived</u> sexual orientation, it did not explicitly define "the victim's religion" in the hate crime statute to encompass a victim's <u>perceived</u> religion. RSA 21:49 states in part that "sexual orientation" means "having or <u>being perceived as having</u> an orientation for heterosexuality, bisexuality, or homosexuality." (Emphasis added.) The defendant contends that the use of this language in RSA 21:49 means that the continuing absence of such language regarding religion in the hate crime statute is indicative of the fact that the legislature intentionally chose not to provide for enhanced punishment for crimes motivated by hostility towards the victim's <u>perceived</u> religion. The State counters that the legislature's use of the word "perceived" in a statutory provision enacted seven years after the hate crime statute — in a separate chapter of the state statutes — is irrelevant to an inquiry as to the intent of the legislature when it enacted the hate crime statute. We agree with the State.

"Statutory context includes earlier-enacted statutes, but does not include later-enacted statutes." <u>State v. Neff</u>, 265 P.3d 62, 65 (Or. App. 2011). Indeed, "[i]f — as in this case — two statutes are involved, the rationale for the later one cannot automatically be transformed by some thaumaturgical feat of rhetorical prestidigitation into the rationale for the preexisting one." <u>Denny v. Westfield State College</u>, 880 F.2d 1465, 1470 (1st Cir. 1989). RSA 21:49 was enacted in 1997 as part of comprehensive legislation prohibiting discrimination based upon sexual orientation. <u>See</u> Laws 1997, 108:1, : 2; <u>cf</u>. Laws 1997, 108:16 (amending the hate crime statute to include a reference to RSA 21:49). In contrast, RSA 651:6, I(f) was enacted in 1990 as a hate crime penalty enhancement. <u>See</u> Laws 1990, 68:1. Accordingly, we conclude that the statutory definition of sexual orientation — enacted seven years after the hate crime statute — cannot, and does not, shed light on the legislature's intent when it enacted the hate crime statute.

The defendant further supports his statutory interpretation by comparing our hate crime statute with statutes from other states. He argues that because statutes in a number of other states refer explicitly to the "actual or perceived" protected status of the victim, <u>see</u> 720 Ill. Comp. Stat. 5/12-7.1 (2002 & Supp. 2012), or to a crime committed "because of" a protected status,

without identifying a victim, see, e.g., N.J. Stat. Ann. § 2C:16–1 (2005 & Supp. 2011), the absence of such terminology in our own statute must indicate the legislature's intent to enhance the penalty only when the victim was accurately targeted as an actual member of a protected class. We are not persuaded.

The mere fact that some states use the word "perceived" in their hate crime statutes, while our legislature has not chosen to use the word "perceived," does not affect our analysis: Although the perceived status of the victims is explicitly stated in the statutes of other states, as we explained above, that basic concept is implicit in our statute. Our task here is to interpret our hate crime statute; the language in other states' statutes is of little assistance. Second, we cannot find, nor has the defendant cited, any case in which a court has interpreted a hate crime statute that, like ours, does not explicitly refer to the defendant's perception of status as a motivating factor as requiring the State to prove the victim's actual religion.

Accordingly, we hold that pursuant to RSA 651:6 the State must prove only that a defendant was substantially motivated to commit a crime because of his hostility towards the victim's perceived "religion, race, creed, sexual orientation . . . , national origin or sex," and that it need not prove the actual status of the victim.

Having construed RSA 651:6, we now address the defendant's challenge to the sufficiency of the evidence. Specifically, we examine whether the defendant has demonstrated that no rational trier of fact, viewing all the evidence and all reasonable inferences from it in the light most favorable to the State, could have found beyond a reasonable doubt the defendant was substantially motivated to commit the crime because of hostility towards Judaism, and that he perceived that Sylvestre and Allard were Jewish. See Noucas, 165 N.H. at 151. The defendant argues that the evidence was insufficient to prove that either victim is Jewish. However, as we have explained, the State was not required to prove that the victims are, in fact, Jewish. The defendant does not argue that the evidence was insufficient to prove that he was substantially motivated to commit the crimes because he perceived Sylvestre and Allard to be Jewish. Indeed, given the evidence adduced at trial, such an argument would not be supportable. Accordingly, the defendant's sufficiency argument fails, and we conclude that the trial court did not err in denying the defendant's motion to dismiss the hate crime enhancement.

## II. Character Evidence

We next address whether the trial court erroneously excluded testimony offered at trial by the defendant to show that he was not motivated to act because of hostility towards the victims' religion.

During the testimony of the defendant's daughter, counsel for the defendant asked, "Can you describe your relationship that you have with [your father]?"  The State objected on the ground of relevance.  The defendant offered this explanation to the trial court:  "It's background.  And the State is also seeking to enhance this with the hate crime statute.  Under [New Hampshire Rule of Evidence 404(a)] I can seek to provide evidence that there is no motive and that [the daughter] has knowledge regarding that."  The trial court sustained the objection, stating, "Talk about the picture, but as far as the rest of it, it's not relevant."

The defendant contends that the trial court erred because the daughter's testimony would have shown that the defendant "did not have the character trait of being motivated by hostility towards Judaism."  The State responds that the trial court did not err because defense counsel's "proffer failed to identify a pertinent trait of character that might have been admissible under Rule 404(a)(1)."  We agree with the State.

"We review challenges to a trial court's evidentiary rulings under our unsustainable exercise of discretion standard and reverse only if the rulings are clearly untenable or unreasonable to the prejudice of a party's case."  Noucas, 165 N.H. at 158 (quotation omitted).  "In determining whether a ruling is a proper exercise of judicial discretion, we consider whether the record establishes an objective basis sufficient to sustain the discretionary decision made."  Id.  "The defendant bears the burden of demonstrating that the trial court's ruling was clearly untenable or unreasonable to the prejudice of his case."  Id.

Although character evidence is generally not admissible, N.H. R. Ev. 404(a), it is admissible if it is evidence of "a pertinent trait of character offered by an accused, or by the prosecution to rebut the same."  N.H. R. Ev. 404(a)(1).  Nonetheless, "[i]n order to predicate error on a trial court's ruling excluding evidence, the proponent of the evidence bears the burden of making a contemporaneous offer of proof sufficient to apprise the court of the specific nature of the excluded evidence."  Noucas, 165 N.H. at 158; see also N.H. R. Ev. 103(b).

Rule 103(b)(2) states:

Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

. . .

(2) <u>Offer of proof</u>. In case the ruling is one excluding evidence, the record indicates that the substance of the evidence was contemporaneously made known to the court by offer of proof.

<u>N.H. R. Ev.</u> 103(b)(2). "The object of Rule 103(b) is to advise the trial judge of a claim of error so that it can be addressed before any damage is beyond correction in the trial court." <u>Noucas</u>, 165 N.H. at 158 (quotation and brackets omitted). It is "the defendant's burden to make a sufficiently specific offer of proof as to the substance of the expected testimony to satisfy the trial court that what he sought to elicit" was relevant. <u>Id.</u>; <u>accord</u> <u>United States v. Adams</u>, 271 F.3d 1236, 1241 (10th Cir. 2001) (explaining that "merely telling the court the content of proposed testimony is not an offer of proof. In order to qualify as an adequate offer of proof, the proponent must, first, describe the evidence and what it tends to show and, second, identify the grounds for admitting the evidence." (citations, quotations and ellipsis omitted)); <u>People v. Morrison</u>, 101 P.3d 568, 586 (Cal. 2004) ("Evidence is properly excluded when the proponent fails to make an adequate offer of proof regarding the relevance or admissibility of the evidence."); <u>see</u> <u>also</u> <u>Bohan v. Ritzo</u>, 141 N.H. 210, 218 (1996) (offer of proof must set "forth the specific basis for admissibility of the proffered evidence").

Here, the defendant failed to make a sufficiently specific offer of proof. Defense counsel asked a question that sought to elicit a statement characterizing the daughter's relationship with the defendant, which the trial court ruled to be irrelevant. Defense counsel represented that the daughter had knowledge that the defendant had no motive, but counsel never apprised the trial court as to the substance of the daughter's expected testimony. Indeed, on appeal, the defendant acknowledges that counsel never explained to the trial court whether the daughter would offer opinion, reputation, or specific instances of character testimony. Nor did trial counsel explain how the question to which the State objected would elicit specific testimony relevant to the defendant's motive, or the lack thereof, or to a pertinent trait of character admissible under Rule 404(a)(1). Given that trial counsel failed to make a sufficiently specific proffer, we conclude that the defendant is precluded from raising this issue on appeal. <u>See</u> <u>So. Willow Properties v. Burlington Coat Factory of N.H.</u>, 159 N.H. 494, 503 (2009) (offer of proof needed to preserve issue for appeal).

<u>Affirmed</u>.

DALIANIS, C.J., and HICKS, CONBOY, and LYNN, JJ., concurred.

10