NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Merrimack
No. 2015-0524


THE STATE OF NEW HAMPSHIRE

v.

ROBERT BREEST

Argued: October 6, 2016
Opinion Issued: February 17, 2017


Joseph A. Foster, attorney general (Elizabeth C. Woodcock and John J. Kennedy, assistant attorneys general, on the brief, and Ms. Woodcock orally), for the State.


Albert E. Scherr, of Concord, by brief, and Boies, Schiller & Flexner LLP, of Armonk, New York (Ian M. Dumain on the brief and orally), for the defendant.


Wilmer Cutler Pickering Hale & Dorr LLP, of Boston, Massachusetts; Washington, D.C.; and Los Angeles, California (Louis W. Tompros, Dino L. LaVerghetta, Richard A. Crudo, and Catherine Owens on the brief), and Bernstein, Shur, Sawyer & Nelson, P.A., of Manchester (Andru H. Volinsky on the brief) for The Innocence Project, Inc., as amicus curiae.

LYNN, J.  In 1973, the defendant, Robert Breest, was convicted of murdering Susan Randall.  Although we affirmed his conviction on direct appeal, see State v. Breest, 116 N.H. 734 (1976), the defendant has maintained his innocence since his conviction and has instituted numerous collateral proceedings in an effort to secure his freedom.[1]  Since 2000, the defendant has succeeded in obtaining multiple rounds of DNA testing of fingernail clippings taken from Randall's body.  All of this testing, including the latest round conducted in 2012, showed that the defendant could not be excluded as a contributor of DNA material found on the clippings.  However, the most recent testing revealed for the first time that the clippings also contained DNA material from another unidentified male contributor.  Based upon the latest test results, the defendant moved for a new trial.[2]  At the hearing on his new trial motion, the State sought to exclude non-DNA evidence that the defendant had proffered, but that was not presented at his original trial.  The Superior Court (Smukler, J.) granted the State's motion to exclude the non-DNA evidence and, following a hearing, denied the motion for a new trial.  The defendant appeals both rulings.  We affirm.

I

The pertinent facts are as follows.  On March 2, 1971, a state highway employee found Randall's body, clothed from the waist up, on the frozen Merrimack River near Interstate Route 93 in Concord.  Randall had been reported missing since February 27 of that year.  The body, located 20 to 25 feet away from a bridge, was placed in a rescue basket by two officers from the Concord Police Department and taken to the Concord Hospital morgue.  There, Dr. George C. Katsas, a board certified forensic pathologist, performed an autopsy.  According to Katsas, Randall's body was heavily bruised as a result of

---

[1] See Breest v. New Hampshire Atty. Gen., 472 F. Supp. 2d 116 (D.N.H. 2007); Breest v. Cunningham, 873 F.2d 1432 (1st Cir.), cert. denied, 493 U.S. 830 (1989); Breest v. Cunningham, 867 F.2d 607 (1st Cir. 1988), cert. denied, 490 U.S. 1083 (1989); Breest v. Cunningham, 784 F.2d 435 (1st Cir.), cert. denied, 479 U.S. 842 (1986); Breest v. Perrin, 495 F. Supp. 287 (D.N.H. 1980), aff'd, 655 F.2d 1 (1st Cir.), cert. denied, 454 U.S. 1059 (1981); Breest v. Perrin, 479 F. Supp. 495 (D.N.H. 1979), aff'd, 624 F.2d 1112 (1st Cir.), cert. denied, 449 U.S. 1020 (1980); Breest v. Helgemoe, 579 F.2d 95 (1st Cir.), cert. denied, 439 U.S. 933 (1978); Breest v. Perrin, 125 N.H. 703 (1984); State v. Breest, 124 N.H. 339 (1983), rev'd, Breest v. Cunningham, 752 F.2d 8 (1st Cir. 1985); Martineau v. Perrin, 119 N.H. 529 (1979); State v. Breest, 118 N.H. 416 (1978), cert. denied, Breest v. New Hampshire, 442 U.S. 931 (1979); Breest v. Helgemoe, 117 N.H. 40 (1977).

[2] The State initially moved to dismiss the defendant's request for a new trial, arguing that he was not entitled to such relief under RSA chapter 651-D (2016) because he obtained the DNA testing with the State's consent rather than by petitioning the court.  State v. Breest, 167 N.H. 210, 211 (2014).  At first, this motion was denied by the trial court, but on the State's motion for reconsideration, the court granted the motion.  Id. at 211-12.  The defendant then appealed to this court, arguing that the trial court erred by concluding that RSA 651-D:2, VI(b) (2016) did not apply to DNA testing obtained with the State's consent.  Id. at 212.  We agreed, vacated the decision and remanded to the trial court for a determination of whether the DNA results were "favorable" under RSA 651-D:2, VI(b) so as to entitle the defendant "to a hearing and, perhaps, other relief under the statute."  Id. at 212-14.

multiple traumas. Her facial and neck area were covered with lacerations and contusions. An internal examination of Randall's body revealed massive injury to the vital organs: her lungs had been severely bruised, her liver was almost split in half, and there were multiple ruptures of her duodenum. Also, Randall's skull had been fractured. Although Katsas conceded that some of the injuries may have been caused by a fall from the nearby bridge onto the frozen river, he asserted that the injuries to the liver and duodenum were rare and were most often caused by kicking the abdominal area. Based upon the autopsy, Katsas concluded that Randall's death had occurred as a result of multiple blunt injuries. He estimated that Randall was killed within a few hours of her last meal, which she ate late in the evening of February 27. Furthermore, in light of her appearance at the time she was found, Katsas believed that Randall had been sexually assaulted. The medical examiner clipped Randall's fingernails, and the police retained the clippings as evidence.

On the night of her death, Randall invited her friend, Judy Jenkins, to visit Randall's apartment on Manchester Street in Manchester. Around 11:45 p.m., Jenkins left Randall in the vicinity of Granite Square in Manchester. At that time, Randall was wearing blue jeans, a sweater, a hip-length brown fur coat, and a brown floppy hat.

One witness testified that while driving through Granite Square shortly after midnight, she saw a young woman hitchhiking in an easterly direction in front of the Chicken House Restaurant. The witness claimed that the woman was wearing a floppy hat, a dark coat, and slacks. When the witness drove by the same area around 12:30 a.m., the woman was gone.

Four individuals sitting in the Chicken House Restaurant also saw a woman hitchhiking. One of the four individuals described her as wearing a floppy brown hat, a fur coat, and dark pants. All four witnesses testified that they saw her enter a white, four-door car with blue interior upholstery. One witness stated that the car was driven by a "big man, I'd say around six feet tall, very broad shoulders, a big head for a man his size." At trial, one individual stated that the driver had a build consistent with the defendant's.

On the night Randall died, several witnesses placed the defendant in Manchester. Around 5:30 p.m., the defendant sought help from two young men to move furniture into the back seat of his white car—a 1964 Ford with blue upholstery. After loading the furniture into his car, the defendant dropped the men off and left Manchester for Lowell, Massachusetts.

Upon arriving in Lowell at 10:30 p.m., the defendant asked Dolor Morel to help him take the furniture out of the car. Morel noticed that the back seat of the car was missing. The defendant told Morel that he was returning to Manchester to get more furniture; Morel saw the defendant leave after 11:00

p.m. and did not see him come back. The following day, Morel noticed the defendant's vehicle parked in the street with the back seat in place.

There also was evidence that the defendant went to Jennie Haggett's residence in Manchester around 11:45 p.m. on February 27. After the defendant spoke with Haggett's son, Haggett told the defendant to leave. Haggett testified that the defendant retrieved an object from the porch and placed it in his car before driving away around 12:10 a.m. on February 28 in the direction of Granite Square. On the morning of March 1, before Randall's body had been found, Haggett went to the Manchester Police Department and reported that a man named "Robert" had come to her Manchester home on the night of February 27th and disturbed her family. She claimed that the man weighed over 200 pounds and was over six feet tall. This description was consistent with the defendant's build.

The day that Randall's body was found, the defendant went to the Manchester Police Department and told an officer that he had heard that a body had been found. The defendant then stated that he thought the police would want to speak with him because he had been "questioned before on things."

On March 15, 1971, Colonel Paul Doyon of the New Hampshire State Police met with the defendant at the defendant's home in Lowell. Doyon explained that he was investigating Randall's homicide and was interested in learning the defendant's whereabouts on February 27, 1971. The defendant provided an account of his activities on February 27 that was consistent with the testimony at trial, with one exception. The defendant told Doyon that, after he unloaded furniture in Lowell, he stayed at home for the rest of the night of February 27. During their conversation, Doyon asked to look at the defendant's vehicle. The defendant consented. Doyon did not see anything incriminating in the vehicle at that time.

However, Doyon observed scratches between the defendant's knuckles, and inquired about them. The defendant stated that the scratches had been caused by a cat. Doyon noted the scratches in his report and stated that the scratches appeared to be consistent with the defendant's explanation because they were not injuries that one would receive from using one's hands in a fight. At trial, Doyon qualified his answer and explained that the injuries were not consistent with injuries that one would receive in a fight insofar as the scratches did not appear to be "offensive injuries." However, the scratches could have been "defensive injuries."

On April 2, 1971, pursuant to a warrant, the police searched the defendant's vehicle for fingerprints, blood, and trace evidence. They removed fibers and paint chips from the vehicle. Roger Beaudoin of the New Hampshire State Police Crime Laboratory microscopically examined the particles and

4

compared them to samples taken from Randall's clothing.  As a result of the examination, Beaudoin concluded that there was a "high degree of probability" that there was contact between Randall's clothing and the defendant's vehicle.  Beaudoin subsequently sent the samples to the chief of the forensic branch of the federal Bureau of Alcohol, Tobacco, and Firearms (ATF).  Using a technology known as neutron–activation analysis, the chief opined that Randall's coat had come in contact with the defendant's vehicle.[3]

In 1973, the defendant was tried for Randall's murder.  At trial, the defendant asserted that he was not in New Hampshire when Randall was killed.  The State presented testimony from David Carita, who had been incarcerated with the defendant while the defendant was contesting extradition from Massachusetts to New Hampshire after his arrest.  Carita testified that when he asked the defendant if he had murdered "Susan," the defendant confessed that he had.  Carita also stated that the defendant told him that he had committed the murder when "[t]here was nobody around."

In its closing argument, the State asserted that the scientific evidence and eyewitness testimony supported its theory that the defendant had picked up Randall, struggled with her, and then beat her to death.  The jury returned a guilty verdict, and the defendant was sentenced to life in prison.

Between 2000 and 2008, three rounds of DNA testing were conducted on Randall's fingernail clippings.  None of these tests excluded the defendant as the contributor of the DNA.  In 2012, with the State's consent, the defendant obtained another round of DNA testing.  Because of the analyst's use of new technology, the DNA test indicated that the fingernail clippings contained DNA from two different males.  The defendant could not be excluded as the contributor of one of the male DNA profiles, but he was excluded as the contributor of the other profile.

Based upon the 2012 test results, the defendant moved for a new trial, pursuant to RSA 651-D:2.  If several prerequisites are met, RSA 651-D:2, which governs post-conviction DNA testing, allows prisoners to "at any time after conviction . . . petition the court for forensic DNA testing of any biological material."  RSA 651-D:2, I.  Paragraph VI(b) states that if the results of the DNA test conducted under the statute "are favorable to the petitioner," the court "shall order a hearing."  Id. at VI(b).  At the conclusion of the hearing, the court "shall enter any order that serves the interests of justice," including an order "setting aside the judgment, discharging the petitioner . . . resentencing the petitioner, or granting a new trial."  Id.

---

[3] Both Beaudoin and the ATF chief subsequently reiterated their conclusions at the defendant's criminal trial.  There, the defendant called two neutron-activation analysis experts who disputed the findings of the chief and concluded that there was insufficient material to conduct a proper analysis.

Prior to a hearing on the defendant's motion, the State moved to exclude three evidentiary items that it argued were unrelated to the 2012 DNA test results: (1) an affidavit from John J. Kelleher, who was imprisoned with the defendant and Carita in 1972–1973, and whose averments tend to undermine Carita's testimony that the defendant confessed to the murder; (2) an affidavit from Dr. Jeffrey Neuschatz, who would have opined on the effect of Carita's testimony on the jury at the 1973 trial; and (3) testimony from Professor Stephen J. Morris discrediting the neutron activation analysis used in the 1973 trial. The trial court granted the State's motion, concluding that the scope of the hearing contemplated by RSA 651-D:2, VI(b) extended to a consideration of the likely impact of only the newly discovered DNA evidence on the outcome of the original trial.

During the hearing, the defendant called Huma Nasir, a DNA laboratory analyst, to present expert testimony on the 2012 test results. Nasir provided an overview of the scientific underpinnings of DNA testing, and also reviewed the previous DNA tests conducted on behalf of the defendant. Furthermore, Nasir discussed the methods used to obtain a DNA sample from a crime scene.

The State called Dr. Charlotte Word, an expert in forensic DNA. Word testified about the limitations of DNA testing and the particular complications and advantages associated with testing DNA located on fingernails. Word also commented on the possibility that contamination occurred through Nasir's manipulation of the DNA test sample, as well as industry methods used to reduce the chances of contamination.

Following the evidentiary hearing, the trial court denied the defendant's motion for a new trial. To determine whether the defendant was entitled to relief under RSA 651-D:2, the trial court applied the three-pronged standard set out in State v. Cossette, 151 N.H. 355 (2004), for considering requests for a new trial based upon newly discovered evidence. See Cossette, 151 N.H. at 361. After noting that "[n]one of the DNA testing done in those multiple tests over multiple years has excluded the defendant as the source of the DNA," the trial court reasoned that, "[i]n this context, [the] DNA evidence not available in 1973 has been more inculpatory than exculpatory." It determined that the mere presence of a second male's DNA under Randall's fingernails did not compel the conclusion that a male other than or in addition to the defendant was involved in her murder. Rather, the trial court found that the second male DNA profile could have been the result of either casual contact between Randall and another male prior to her murder, or posthumous contamination that occurred during or after the murder investigation. Consequently, the trial court concluded that the defendant failed to sustain his burden of proving that the new DNA evidence would probably result in an acquittal.

6

## II

On appeal, the defendant contends that the trial court's decision denying him a new trial should be vacated because the trial court erred by: (1) concluding that, to obtain a new trial under RSA 651-D:2, the defendant was required to show that a new trial would result in an acquittal rather than merely a hung jury; (2) not finding a hung jury to be a "different result" under the Cossette standard, which the trial court applied in its RSA 651-D:2 analysis; (3) excluding new non-DNA evidence that, the defendant asserts, would alter the outcome in a retrial; and (4) failing to properly weigh the evidence. We address these arguments in turn.

## A

The defendant first contends that, to obtain a new trial, he must show only that there would be "at least a hung jury" rather than an acquittal, were he to be retried. This standard, he asserts, is "consistent with the text of RSA 651-D:2," the statute governing post-conviction DNA testing, because a hung jury would be "favorable" under the terms of the statute.

RSA 651-D:2 states, in relevant part:

> In addition to any other substantive or procedural remedies
> provided by applicable law, if the results of DNA testing conducted
> under this section are favorable to the petitioner, the court shall
> order a hearing and shall enter any order that serves the interests
> of justice, including an order vacating and setting aside the
> judgment, discharging the petitioner if the petitioner is in custody,
> resentencing the petitioner, or granting a new trial.

RSA 651-D:2, VI(b).

Resolution of this issue requires us to engage in statutory interpretation. "The interpretation of a statute is a question of law, which we review de novo." State v. Costella, 166 N.H. 705, 709 (2014) (quotation omitted). "In matters of statutory interpretation, we are the final arbiters of the intent of the legislature as expressed in the words of a statute considered as a whole." Id. (quotation omitted). "When examining the language of the statute, we ascribe the plain and ordinary meaning to the words used." Id. (quotation omitted). "We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include." Id. (quotation omitted).

The defendant argues that an acquittal standard is inconsistent with the text of RSA 651-D:2, VI(b) because the text contemplates relief when the new

7

DNA test results are "favorable," and a hung jury would be a "favorable" outcome.

A plain reading of the statute shows that the word "favorable" refers to the results of the DNA testing, not the ultimate disposition of the court case for which the testing is conducted. See RSA 651-D:2, VI(b) (stating that a hearing will occur "if the results of DNA testing . . . are favorable to the petitioner"). The results of a DNA test are favorable insofar as they are exculpatory and unfavorable insofar as they are inculpatory. A hung jury is not an outcome, favorable or otherwise, of a DNA test. To be sure, a hung jury is an outcome that may be obtained if a new trial is ordered. The statute, however, requires only a hearing if the DNA results are favorable, not a trial. See id. After the hearing, a court may order a trial if the evidence produced at the hearing demonstrates that such relief is warranted, but the court is not required to grant a new trial (or any other relief) merely because the DNA test results were "favorable." See id. Rather, the statute requires the court to "enter any order that serves the interests of justice," which may, in certain circumstances, warrant no relief other than the hearing itself. See id. Thus, in RSA 651-D:2, VI(b), "favorable" defines the prerequisite condition, i.e., favorable DNA test results, that can give rise to every possible outcome that may follow from a hearing.[4] See id.

---

[4] The defendant advances three ancillary arguments, claiming: (1) that the State would not retry him after a mistrial caused by a hung jury, thus rendering a hung jury equivalent to an acquittal; (2) that adopting an "acquittal" standard would render the phrase "retrying or resentencing the petitioner" in section VI(b) superfluous; and (3) that, because the word "exonerate" is used twice in the portion of the statute dealing with the prerequisites that must be met to obtain DNA testing, see RSA 651-D:2, I(b) and III(e), but is not used in the remedial provisions of paragraph VI(b), the legislature intended a hung jury to suffice as "favorable."

Based on our interpretation of RSA 651-D:2, the defendant's argument that the State would not retry him after a mistrial, thus rendering a hung jury equivalent to an acquittal, is immaterial because "favorable" as used in the statute does not pertain to court outcomes.

As to the second ancillary argument, it seems apparent that the legislature specified the different types of relief that a court may grant, i.e., vacating and setting aside the judgment of conviction, resentencing, or granting a new trial, to accommodate the plethora of circumstances a court may encounter in cases coming within the purview of the statute. For example, there may be some cases where DNA evidence would conclusively establish that a defendant did not commit the crime, and therefore is entitled to a final judgment vacating his conviction. In other cases, the DNA evidence may entitle the defendant to obtain a new trial, but not final exoneration; and in still others the DNA evidence would show the defendant to be innocent of some but not all crimes of which he was convicted (or to have committed a less serious offense than that of which he was convicted), and thus be entitled only to a reduction of his sentence.

With respect to the defendant's final ancillary argument, although we acknowledge the legislature's use of different terms in the sections of the statute dealing with prerequisites to testing and available remedies after testing has occurred, such difference cannot sensibly be construed to mean that when the legislature used the word "exonerate" in the former sections it intended that a defendant must make a greater showing just to obtain testing than he needs to make to obtain relief based on the "favorable" outcome of the testing. See RSA 651-D:2, VI(b); see also Breest, 167 N.H. at 212-13 (a statute will not be construed in such a manner as to lead to an absurd result). In fact, as paragraph III(e) specifically states, the prerequisite to ordering testing

B

We next consider the defendant's assertion that the trial court erroneously concluded that evidence leading to a probable mistrial would be insufficient to grant a retrial under the Cossette new trial standard.[5]

To procure a new trial based upon newly discovered evidence, a defendant must prove "(1) that he was not at fault for failing to discover the evidence at the former trial; (2) that the evidence is admissible, material to the merits and not cumulative; and (3) that the evidence is of such a character that a different result will probably be reached upon another trial." Cossette, 151 N.H. at 361. "Whether newly discovered evidence requires a new trial is a question of fact for the trial court." Id. "We will sustain the trial court's decision unless its conclusion is clearly unreasonable." Id.

Here, the defendant disputes only the third prong of the standard, and argues that a hung jury qualifies as a "different result." Such an interpretation is unsupported by our case law. More than 150 years ago, we first elucidated the standard that would apply to new trial requests based upon newly discovered evidence. In Crafts v. The Union Mutual Fire Insurance Co., 36 N.H. 44, 51 (1858), this court stated that it would grant a new trial if it was probable that the newly discovered evidence "would have controlled the verdict, and produced a different result." Id. Crafts establishes that the word "result" is interchangeable with "verdict." See id.; see also State v. Chase, 135 N.H. 209, 212-13 (1991) (noting the reason that the generic term "result" was chosen over "verdict" in the standard for ineffective assistance is because the standard for ineffective assistance, like the standard for a new trial, is "intended to apply to more than one type of proceeding"). Black's Law Dictionary defines "hung jury" as a "jury that cannot reach a verdict by the required voting margin." Black's Law Dictionary 987 (10th ed. 2014). Consequently, a hung jury cannot be considered a verdict. If a hung jury is not a verdict, and "verdict" is the equivalent of "result," it follows that a hung jury is not a "result" under the standard for a new trial.

We confirmed this view in Chase, 135 N.H. at 210. In that case, the defendant, who had been convicted of felonious sexual assault, moved for a new trial based upon ineffective assistance of counsel. Id. Similar to our standard for granting a new trial based upon newly discovered evidence, we have established that a defendant seeking a new trial based upon a claim of ineffective assistance of counsel must prove that the "result of the proceeding

---

requires, among other things, merely a showing by clear and convincing evidence that "[i]f the . . . DNA testing produces exculpatory results, the testing will constitute new, noncumulative material evidence that will exonerate the petitioner . . . ." RSA 651-D:2, III(e).

[5] The parties do not contest the applicability of the standard to this situation, so we will assume without deciding that the standard is applicable here.

would have been different" but for his counsel's "unprofessional errors." Id. at 212 (quotation omitted). The defendant in Chase contended that he would have been entitled to a new trial if he could merely "show a reasonable likelihood of a mistrial based on a hung jury." Id. "Thus reading 'result' not to be equivalent to 'verdict,' [the defendant] argue[d] that he should prevail if the additional evidence would have persuaded only one juror to acquit. . . ." Id. We ruled that the "defendant [read] too much into the . . . use of the term 'result of the proceeding,'" because the standard for ineffective assistance, like the standard for a new trial, is "intended to apply to more than one type of proceeding." Id. at 212-13. Therefore, we held that a hung jury does not qualify as a "different result." Id.[6]

Given our established law on this issue, we find it unnecessary to address the decisions of courts in other states interpreting their particular statutes. We find that the trial court did not err in ruling that a showing of the probability of a hung jury on retrial was insufficient to meet the defendant's burden for obtaining a new trial.

C

The defendant next argues that the trial court erred by excluding from the hearing non-DNA evidence that he asserts would be available at a new trial and would undermine the State's case against him. The specific evidence that the court excluded was the affidavits of Kelleher, Neuschatz, and Morris. The defendant argues that the exclusion of this evidence was inconsistent with the language of the new trial standard, the policy and legislative history of RSA 651-D:2, and the applicable case law from other jurisdictions.

"We review challenges to a trial court's evidentiary rulings under our unsustainable exercise of discretion standard and reverse only if the rulings are clearly untenable or unreasonable to the prejudice of a party's case." State v. Noucas, 165 N.H. 146, 158 (2013) (quotation omitted). "In determining whether a ruling is a proper exercise of judicial discretion, we consider whether the record establishes an objective basis sufficient to sustain the discretionary decision made." Id.

The defendant's assertion that the new trial standard generally considers the import of new evidence in terms of its bearing on the likely outcome of another trial is correct. Yet, as applied to this case, his argument overlooks a

---

[6] The defendant criticizes the trial court's reliance upon State v. Bader, 148 N.H. 265 (2002), claiming that Bader is inapplicable because it did not directly address the question of whether a "hung jury" sufficed to meet the new trial standard. Although it is true that Bader did not specifically consider the hung jury issue, we see no basis for faulting the trial court's reliance on the case for the proposition that newly discovered evidence can serve as the basis for a new trial only when it is of such character that it "will probably result in an acquittal upon retrial." Bader, 148 N.H. at 285 (quotation omitted).

critical step: the procedure outlined by RSA 651-D:2. Because RSA 651-D:2, VI(b) creates a mechanism for a defendant to obtain relief based upon new DNA evidence in circumstances in which a new trial would not otherwise be available, see RSA chapter 526 (2007), the conditions and limitations imposed by the statute as prerequisite to such relief must be strictly observed.[7]

Here, the trial court's exclusion of the non-DNA evidence is in accord with the terms of RSA 651-D:2. Under the statutory scheme, the petitioner must first request new DNA testing. See RSA 651-D:2, I. If the results of that testing are favorable, then a hearing is granted. See id. at VI(b). At the hearing, the court shall "enter any order that serves the interests of justice," including an order setting aside the conviction or granting a new trial. Id. The hearing functions as a preliminary step that precedes a full repetition of the original trial, and is occasioned not by the discovery of any type of new evidence, but by the discovery of "favorable" new DNA evidence. See id. At no point in RSA chapter 651-D is non-DNA evidence mentioned. See RSA ch. 651-D. Thus, we conclude that the legislature did not intend to expand the scope of the hearing required by RSA 651-D:2, VI(b) to consider the potential impact of non-DNA evidence.

We are concerned by the potential for abuse that could arise under the defendant's interpretation of the statute. RSA 651-D:2 creates a unique mechanism for overturning a criminal conviction based upon DNA evidence. Absent that mechanism, an individual's motion for a new trial is barred by the statute of limitations after three years. See RSA 526:4 (2007) (providing that "[a] new trial shall not be granted unless the petition is filed within three years after the rendition of the judgment complained of, or the failure of the suit"). An expansive reading of RSA 651-D:2 could undermine this purpose by permitting even marginally favorable DNA evidence to serve as the catalyst for the grant of a new trial based upon the untimely production of non-DNA evidence.[8]

---

[7] Because we are considering the unique procedure established by a statute specifically concerned with new DNA evidence, the evidentiary practices observed in federal habeas corpus law, which the defendant claims are analogous, are similarly inapt.

[8] The trial court relied upon an Illinois case, People v. Dodds, 801 N.E.2d 63, 72 (Ill. App. Ct. 2003) in which an Illinois appellate court evaluated a convicted murderer's request for a new trial based on DNA evidence. The DNA evidence was collected pursuant to the Illinois statute upon which RSA chapter 651-D was partially based. Id. at 66. Reversing the trial court's denial of relief, the appellate court remanded with instructions for the trial court to hold an evidentiary hearing and "consider the trial evidence in light of the new DNA results to determine whether those DNA results are so conclusive to warrant a new trial." Id. at 72.

The defendant argues that we should instead rely upon People v. Starks, 850 N.E.2d 206 (Ill. App. Ct. 2006). Starks, relying upon Dodds, indicated that a trial court should determine whether new "DNA evidence is so conclusive that it would probably change the outcome on retrial." Starks, 850 N.E.2d at 213. The Starks court then considered new DNA test results as well as evidence demonstrating that the State's serology expert had presented "untruthful or inaccurate" testimony by testifying contrary to the original serology test results.

However, there is no indication that the State in Starks objected to consideration of evidence of the serology expert's incorrect testimony. See id. at 213-14. Additionally, the

11

Accordingly, we conclude that the trial court did not err in excluding the non-DNA evidence from the hearing.

D

Finally, the defendant argues that the trial court's ruling that the new DNA test results did not warrant a new trial was against the weight of the evidence. Specifically, the defendant contends that the presence of a second male DNA profile inevitably leads to the conclusion that Randall was attacked by a second assailant, which, in turn, upends the State's theory of the case at the original trial that the defendant acted alone in murdering Randall. To the extent that the trial court considered other explanations for the second male DNA profile, like contamination and casual contact, the defendant claims the court "credited speculation." We disagree.

"Whether newly discovered evidence requires a new trial is a question of fact for the trial court." Cossette, 151 N.H. at 361 (quotation omitted). We will sustain the trial court's decision unless its conclusion is clearly unreasonable. Id. (quotation omitted). Contrary to the defendant's assertion, the evidence presented at the hearing does not point definitively to the conclusion that the second DNA profile arose from another assailant. There is ample support in the record for the trial court's finding that the other unknown male DNA found on the victim's fingernail clippings could have resulted from either casual contact or contamination. The record makes it clear that these alternatives to the defendant's "second assailant" theory were not mere speculation.

The State's expert, Dr. Word, opined that casual contact, which included handshakes, eating at a restaurant, and even "passing people," could have deposited foreign DNA under Randall's fingernails.[9] Both of the experts who testified conceded that the specter of contamination was a significant concern. The defendant's expert, Huma Nasir, stated that it was possible for a medical examiner conducting an autopsy in the 1970s to use the same nail clippers on multiple bodies. According to Word, this practice would have led to significant contamination. The defendant points to the conclusions in a 2014 book authored by Professor Peter Gill, a "leading authority" in the field of DNA

---

defendant discovered that the serology testimony was incorrect "[a]s a result of defendant's expert's DNA report." Id. at 211 (emphasis added). Without guidance from the Starks court, we cannot know whether the court considered the serology evidence because Illinois's post-conviction DNA statute allows the court to consider new, non-DNA evidence, because the court considered the serology evidence to be DNA evidence, or because the State simply did not object to consideration of the evidence. Thus, Starks provides scant support for the defendant's argument that we should interpret RSA 651-D:2, VI(b) to permit consideration of new non-DNA evidence.

[9] The defendant faults Word for not identifying when and how the contamination occurred. However, the inability to do so hardly seems untoward, given the fact that current technology does not permit determination of the circumstances under which the DNA was deposited nor at what time it was deposited.

evidence.  The book summarized several studies, each asserting that the chances of observing a foreign DNA profile under an individual's fingernails absent "intimate contact" are low.  Word, however, testified that there are "many studies" contradicting those findings.

To support his argument that the trial court credited "speculation" when considering the possibility of contamination, the defendant points to Nasir's testimony regarding the measures she took in preparing the DNA samples for the 2012 test.  These measures included using isopropanol and a Bunsen burner to sterilize the lab equipment.  Word, however, noted that she knew of no studies indicating that Nasir's methods were effective in removing casual-contact-based or contamination-based DNA.[10]  With regard to the isopropanol used to remove the DNA, Word observed that it "[would] do nothing to the DNA."  On the contrary, Word noted that if there were already contaminating DNA on the instruments, "the isopropanol [would] help preserve it quite nicely."  Other complications arising from DNA testing were mentioned as well.  These complications include stochastic effects, which distort the observed relative concentrations of multiple DNA profiles, and DNA degradation.

More importantly, all four of the DNA tests conducted since 2000 have failed to exclude the defendant as the source of some of the male DNA under Randall's fingernails, thus further contradicting his position at trial that he had never interacted with Randall and was not in the State when she was killed.  This is especially consequential in light of the relatively low prevalence of the alleles (the variational forms of a gene appearing on a chromosome) tested on the fingernail clippings, according to evidence presented to the trial court.  The alleles, which are consistent with the defendant's alleles, statistically appear in the Caucasian population only "roughly one time out of 140,000 individuals[,] in the African American population roughly once in 26,000 individuals and in the Hispanic population approximately once in 32,000 individuals."  Viewed together with the evidence presented at the defendant's original trial, we agree with the trial court that, even considering the 2012 test results, the DNA evidence is "more inculpatory than exculpatory."[11]

---

[10] According to Word, the most effective method for reducing the possibility of DNA contamination is by soaking DNA samples in bleach for "an extensive period" of time.  Even then, the bleach does not remove the DNA, but merely "breaks it up into small enough pieces" that it cannot be detected by DNA testing systems.  Regardless, that measure was not utilized here.

[11] The defendant asserts that the presence of a second male profile, assuming it came from an assailant, upends the State's theory at trial.  In support of his position, he cites a trial court order issued in 2000 that allowed him to undergo the first round of DNA testing.  There, the court stated that a "negative DNA match between the defendant and the material underneath Ms. Randall's nails" meant either that the "defendant was not the killer," or that Randall "had a violent struggle with some person other than the defendant immediately prior to being killed by him."  The court wrote that either of these scenarios would be "radically different from the State's argument to the jury" and would seriously undermine confidence in the defendant's conviction.  The defendant's reliance on the court's 2000 decision is misplaced because the test reaffirmed that the defendant cannot be excluded as the contributor of some of the DNA material found on

The defendant relies upon what he asserts is an analogous case, an unreported Illinois trial court order, People v. Andersen, 80 C 01405, at 1-3 (Ill. Cir. Ct. Cook Cty. July 20, 2015). There, the petitioner was convicted of first degree murder in 1980 based on his confession that he had killed the victim with a knife that had been found by police near the crime scene. Id. at 2, 8. The police tested blood found on the knife and discovered that it was Type A blood, which matched the victim's blood type. Id. at 8. In 2013, the petitioner successfully moved for DNA testing to be conducted on the knife and on fingernail clippings from the victim. Id. at 4-5, 8-9. The petitioner was definitively excluded from both samples. Id. at 4. In addition, the victim was excluded as a source of DNA for the blood found on the knife. Id. at 4. At the hearing on the petitioner's motion for a new trial, the State "question[ed] the reliability" of the test outcomes, asserting contamination as the source of the aberrant results. Id. at 5. Yet the State did not present any experts or scholarly articles to support its claim, nor did it contest the academic works that the petitioner had submitted. Id. at 7.

We find that Andersen is inapposite here.[12] First, the results obtained from both the knife and the fingernail clippings in Andersen definitively excluded the petitioner, whereas the latest DNA results here only exclude the defendant as the contributor of one of the DNA profiles. Id. at 4. Second, there was only one test in Andersen, whereas here there were three previous DNA tests on the victim's fingernails, each of which failed to exclude the defendant as the DNA source. Id. at 4-5, 8-9. Third, the State in Andersen presented no evidence to support its contamination theory, nor did it rebut the academic articles that the petitioner had submitted. Id. at 5, 7. Here, the State called an expert in forensic science who stated that contamination was a definite possibility, and rebutted the academic studies cited by the defendant.

Furthermore, the new DNA evidence must be considered in light of the original trial evidence. See Cossette, 151 N.H. at 361 (requiring a defendant seeking a new trial to prove that the new evidence "is of such a character that a

Randall's fingernail clippings. The statements in the court's 2000 decision were predicated on the assumption that only one DNA sample would be found that would either be consistent or inconsistent with the defendant's profile. It did not envision the possibility that multiple DNA profiles might be recovered from the clippings, nor did it consider the prospect that another DNA contributor could result from casual contact or contamination.

[12] We also find unpersuasive the defendant's reliance on Commonwealth v. Clark, Nos. 92-CR-42, 92-CR-43 (Ky. Meade Cir. Ct., July 14, 2016), which he submitted as late authority. See Sup. Ct. R. 16(7). Similar to Andersen, Clark is readily distinguishable from this case in the following respects, among others: (1) DNA testing of a hair found on the victim's body, and which the prosecution asserted at trial belonged to one defendant, was definitively determined not to be the hair of that defendant; (2) DNA testing of a cloth which the defendant testified at trial contained his own blood resulting from his cutting his hand, but which the prosecution asserted was animal blood resulting from a ritualistic satanic killing of an animal, was determined to be, in fact, the defendant's own blood; and (3) the prosecution introduced no evidence refuting the aforesaid DNA test results.

different result will probably be reached upon another trial").  At trial the defendant claimed that he had no contact with Randall at any time.  He further claimed that he was not in New Hampshire at the time she was murdered.

However, the State presented evidence that the defendant left Haggett's Manchester residence around 12:10 a.m. heading in the direction of Granite Square.  Multiple witnesses testified to seeing a woman matching Randall's description hitchhiking near Granite Square shortly after midnight.  Other witnesses testified that the woman got into a car that matched the appearance of the defendant's car.  Furthermore, one witness gave a description of the driver that was consistent with the defendant.  The same day that Randall's body was found, the defendant went to the police station and stated that he heard a body had been found and thought the police would want to speak with him.

Doyon interviewed the defendant two weeks after Randall's body was found and noticed scratches between the defendant's knuckles.  At trial, Doyon testified that those scratches were consistent with "defensive" wounds received in a fight.  During the trial, the State presented forensic evidence linking the defendant's car to Randall's clothing, as well as testimony from Carita, who claimed that the defendant had confessed to murdering Randall.

We cannot conclude that a fact finder, having heard: (1) all of the evidence offered against the defendant at his original trial; (2) evidence unavailable at that trial that the defendant could not be excluded as the contributor of at least some of the DNA found under Randall's fingernails; and (3) evidence unavailable at that trial of the possible origins of the other unknown male DNA contributor, would probably return a verdict different from that rendered by the original jury.  Consequently, we hold that the trial court's denial of the defendant's motion for a new trial was not clearly unreasonable or contrary to the weight of the evidence.

<u>Affirmed</u>.

DALIANIS, C.J., and HICKS and BASSETT, JJ., concurred.

15