Merrimack
No. 2011-889

THE STATE OF NEW HAMPSHIRE

v.

KAREN GAGNE

Argued: March 14, 2013
Opinion Issued: November 5, 2013

*Michael A. Delaney*, attorney general (*Jeffrey S. Cahill*, senior assistant attorney general, on the brief and orally), for the State.

*Brianna M. Sinon*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

BASSETT, J. The defendant, Karen Gagne, appeals her convictions following a jury trial in Superior Court (*Smukler*, J.) of nine counts of theft by unauthorized taking, *see* RSA 637:3 (2007), and two counts of theft by misapplication of property, *see* RSA 637:10 (2007). She argues that the trial court erred in denying her motion to dismiss for insufficient evidence. We affirm her convictions on nine counts, reverse her convictions on two counts, and remand.

The jury could have found the following facts. The defendant met the victim in the 1980s when the defendant performed landscaping services at the victim's home. The two became friends and subsequently lived together as companions in the victim's home for at least one year until the victim asked the defendant to move out.

In the summer of 2006, the defendant and the victim rekindled their friendship. The victim moved to Pleasant View Retirement Home (Pleasant View), and the defendant began driving the victim to doctors' appointments and nail appointments, and taking her to lunch. In addition, although the victim had previously had an accountant pay her larger bills, the defendant began handling the victim's bills, including payment of her rent at Pleasant

View. At that time, the victim's monthly income was approximately $5,000, comprised of $900 from Social Security, $3,000 from an RBC annuity, $615 from a trust, and $400 from an OM Financial annuity. The victim also owned several properties, including a home in Florida.

On April 6, 2007, the victim's OM Financial annuity of $89,000 was liquidated and deposited into her Bow Mills bank account. The defendant endorsed the back of the annuity check "For deposit only." On April 13, the defendant and the victim opened a joint bank account (joint account) at Citizen's Bank. The victim understood that the purpose of the joint account was to allow the defendant to better assist her with paying bills or cashing checks. The victim never told the defendant that she could take money from the joint account for her own use. On April 18, $60,000 was transferred from the victim's Bow Mills account to the joint account. Shortly thereafter, the victim's RBC annuity, with a value in excess of $350,000, was liquidated and deposited into the joint account. The endorsement on the back of the liquidation check was in the defendant's handwriting. Between mid-April and September 2007, the defendant withdrew more than $180,000 from the joint account. This money was deposited in the defendant's personal accounts, and then used to pay various creditors of the defendant.

In October 2007, the defendant took out a loan in the amount of $90,000 from Merrimack County Savings Bank (MCSB). The loan was secured by a $100,000 certificate of deposit owned by the victim. The defendant and the victim were both present at the closing of the loan, at which the MCSB assistant branch manager explained to them each paragraph of the loan documents. Thereafter, in May 2008, at the victim's request, the defendant's loan was paid off using the funds from the victim's certificate of deposit.

In the fall of 2008, the victim fell behind in her rent payments at Pleasant View. The business office manager spoke with the defendant because the defendant "was picking up [the victim's] bills." The defendant first told the business office manager that there was a difficulty with one of the victim's bank accounts, but later said that the victim's grandson or nephew had stolen money from the victim "and that she and the family and the bank were trying to work [it] out." At some point in late 2008, during a conversation between the executive director of Pleasant View, the victim, and the defendant about the victim's bill, the victim stated that she had put her Florida property on the market and they were waiting for it to be sold. Pleasant View received "back payment" for the victim's unpaid rent in January 2009; however, following that payment, the victim again fell behind in her rent. The business office manager again contacted the defendant because, at that point, the defendant had notified her that the victim was

misplacing the bills or throwing them away and the defendant said "that she would pick up the bill and make sure that it was paid."

In October 2009, the business office manager told the defendant that the victim was so far behind in her rent that the legal department would be contacting the victim directly. The defendant responded that she was trying to get the victim's bill paid. The business office manager gave her one week to do so. When the victim's bill remained unpaid, the business office manager went to the executive director and they both then had another conversation with the victim about her delinquent rent. The business office manager testified that the victim was "very upset" and that she did not understand how it had happened that she was so far behind. Thereafter, Pleasant View's executive director contacted the Attorney General's Office.

The defendant was charged with nine counts of theft by unauthorized taking and two counts of theft by misapplication of property. An eight-day trial was held in 2011. At the close of all of the evidence, the defendant moved to dismiss the charges based upon insufficiency of the evidence. The trial court denied the motion, and the jury returned a guilty verdict on all counts.

On appeal, the defendant argues that the trial court erred in denying her motion to dismiss. She contends that there was insufficient evidence to convict her of any of the charges.

█ Our standard of review of the trial court's denial of the defendant's motion to dismiss is well established. *State v. Marshall*, 162 N.H. 657, 666 (2011). "To prevail upon [her] challenge to the sufficiency of the evidence, the defendant must prove that no rational trier of fact, viewing all of the evidence and all reasonable inferences from it in the light most favorable to the State, could have found guilt beyond a reasonable doubt." *Id.* (quotation omitted). We review the evidence in context, and not in isolation. *State v. Huffman*, 154 N.H. 678, 686 (2007). "Circumstantial evidence may be sufficient to support a finding of guilty beyond a reasonable doubt." *State v. Guay*, 162 N.H. 375, 381 (2011) (quotation omitted). When the evidence is solely circumstantial as to an element, it must exclude all reasonable conclusions except guilt. *State v. Germain*, 165 N.H. 350, 361 (2013). We emphasize, however, that the proper analysis is not whether every possible conclusion has been excluded, but whether other reasonable conclusions have been excluded. *Id.*

*I. Theft by Unauthorized Taking*

The defendant first argues that the State introduced insufficient evidence to convict her of the nine charges of theft by unauthorized taking. Pursuant to RSA 637:3, I, a person is guilty of the crime of theft by unauthorized

taking "if he obtains or exercises unauthorized control over the property of another with a purpose to deprive him thereof." Thus, the State was required to prove that the defendant (1) obtained or exercised unauthorized control over; (2) the property of another; (3) with the purpose to deprive the other of the property. *See* RSA 637:3; *see also* RSA 637:2, IV (2007) (defining "property of another").

The defendant maintains that, with respect to two of the charges, the evidence was insufficient to prove that the transactions at issue were unauthorized. She further contends that there was insufficient evidence to prove that the property at issue in the remaining charges was the property of another. We address each argument in turn.

### A. *Unauthorized Control*

#### 1. *Bow Mills Account*

The defendant argues that there was insufficient evidence to convict her of the charge which alleged, in relevant part, that the defendant "took $26,750 from a Bow Mills Bank account belonging to [the victim] through a series of transactions, transferred the money without authorization to [the defendant's] accounts . . . , and used the proceeds for her own benefit." Considering the evidence and all reasonable inferences to be drawn from it in the light most favorable to the State, we agree that the evidence was insufficient to prove that the defendant committed this offense.

■ The State presented evidence that from January to April 2007, six checks from the victim's Bow Mills bank account were made payable to the defendant. Although the payee section was filled out in the defendant's handwriting, the victim signed each check. The State contends that, because the victim testified that the defendant helped her pay her bills, "[i]t was reasonable for the jury to find that [the victim] would not have hesitated to sign blank checks, trusting that the defendant would properly handle the rest." We disagree. There was no evidence that the victim signed the checks *before* the defendant filled them out. Nor was there any evidence that the victim signed the checks without first reviewing the payee section. *Cf. State v. Emery*, 152 N.H. 783, 788 (2005) (holding that evidence was sufficient to prove that use of funds was unauthorized where "nothing in the record" indicated that victim looked at checks before he signed them and there was testimony that victim did not usually look at checks that he signed). Rather, the victim testified that the defendant "might fill out a check and I would sign it." She further testified that she would not sign paperwork presented to her unless she understood it and without first "perus[ing] it somewhat." Indeed, when questioned as to whether she would sign something if the defendant recommended that she do so, the victim

stated, "Not unless she explained it in detail. If it was well explained to me but not cold, not just here, sign this paper. No way." Accordingly, viewing this evidence in the light most favorable to the State, we conclude that a rational juror could not have found beyond a reasonable doubt that the victim did not authorize the checks at issue and we therefore reverse the defendant's conviction on this charge.

## 2. *Certificate of Deposit*

The defendant further argues that the State failed to prove that she was unauthorized to use the victim's certificate of deposit to secure and repay her loan from MCSB. She maintains that because the victim "signed the loan application[,] . . . attended the closing of the loan, and . . . personally directed the bank to repay the loan using her certificate of deposit," she authorized the defendant's use of these funds.

At trial, the victim testified that she authorized use of her certificate of deposit as collateral for the defendant's loan, and further acknowledged that it was her signature on the loan paperwork. She stated that she would not have signed the paperwork without first having read it or having it "translated" to her. The victim acknowledged that she sent a letter to MCSB directing the bank to use her certificate of deposit to pay off the defendant's loan, and to deposit the remainder into her checking account. The MCSB assistant branch manager confirmed that the victim's certificate of deposit was used as collateral for the defendant's loan, and further testified that she was present when the victim signed the paperwork assigning the certificate of deposit as collateral for the loan. She stated that she would have explained the paperwork to both the defendant and the victim. She further testified that the victim was present at the closing of the loan and that the victim was aware of the amount of the loan. She stated that the victim later came into the bank and requested that the collateral be used to pay off the defendant's loan.

The State argues that the jury could reasonably infer from the victim's "relative frugality" that she did not authorize the money from the certificate of deposit to be used as collateral for, or to pay off, the defendant's loan. In addition, the State cites evidence related to other charges that it contends supports the inference "that the defendant either purposely did not explain to [the victim], or actively deceived her, with regard to the loan related documents she signed." However, in light of the evidence presented, these inferences are not sufficient to establish, beyond a reasonable doubt, that the victim did not authorize the use of her certificate of deposit to pay off the defendant's loan. Under these circumstances, we conclude that the evidence was insufficient to prove that the defendant committed theft by

unauthorized taking when she used the funds from the victim's certificate of deposit to pay off her loan. The defendant's conviction on this charge is, accordingly, reversed.

### B. *Property of Another*

The defendant next argues that there was insufficient evidence to prove that the property at issue in the remaining charges of theft by unauthorized taking was the property of another because it was held in the joint account. The State contends that this argument is not preserved for appellate review.

A motion to dismiss must state the specific ground upon which it is based in order to preserve the issue for appeal. *Guay*, 162 N.H. at 380. Here, at the close of all of the evidence, the defendant moved to dismiss, for insufficient evidence, the charges related to the joint account because a "fundamental [principle] of a joint account [is] that it is jointly owned and that each [has] equal and total rights to the account," and, therefore, once money is placed into a joint account, "each person has complete authority to withdraw, close or move funds." The defendant makes the same argument on appeal. Thus, we conclude that the argument was properly preserved and address the merits of the argument.

The defendant argues that there was insufficient evidence to convict her of theft by unauthorized taking from the joint account because "[t]he language of RSA 637:2, IV, defining 'property of another,' excludes joint accounts." We have never directly addressed whether a party to a joint checking account may be convicted of stealing from the other party to the account by making unauthorized withdrawals. *See Emery*, 152 N.H. at 787 (addressing similar issue under plain error rule). Resolution of this issue requires that we engage in statutory interpretation. The interpretation of a statute is a question of law, which we review *de novo*. *State v. Thompson*, 164 N.H. 447, 448 (2012). In matters of statutory interpretation, we are the final arbiters of the intent of the legislature as expressed in the words of a statute considered as a whole. *Id.* When examining the language of the statute, we ascribe the plain and ordinary meaning to the words used. *Id.* We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. *Id.* We construe the Criminal Code "according to the fair import of [its] terms and to promote justice." RSA 625:3 (2007).

RSA 637:2, IV defines "property of another," in relevant part, as "property in which any person other than the actor has an interest which the actor is not privileged to infringe, regardless of the fact that the actor

also has an interest in the property." The plain language of the statute makes clear that whether the person charged has an interest in the property is irrelevant. The plain language of the statute thus supports the conclusion that the definition of "[p]roperty of another" includes a joint bank account. *See Com. v. Mescall*, 592 A.2d 687, 691 (Pa. Super. Ct. 1991) (interpreting Pennsylvania statute with same language and concluding that whether defendant may have an interest in property is irrelevant).

█ Moreover, even assuming that the term "property of another" could be deemed ambiguous, we would not interpret the statute as the defendant suggests. The legislative history of the statute supports our view that "[p]roperty of another" includes a joint bank account. In drafting the statute, the Commission to Recommend Codification of Criminal Laws (Commission) explained that it establishes "the general rule that unauthorized dealing with other interests in the same property [that the thief also has an interest in] can give rise to theft liability." Commission to Recommend Codification of Criminal Laws, REPORT OF COMMISSION TO RECOMMEND CODIFICATION OF CRIMINAL LAWS § 582:2 cmts. at 62 (1969). The Commission explained that this rule reversed prior case law "holding that a partner cannot steal partnership property." *Id.* Consistent with the Commission's report, we have since observed that the purpose of RSA 637:2, IV is to include within the sweep of the Criminal Code property in which more than one person has an interest — *e.g.*, partnership property, leased property, and property held by joint tenancy or by tenancy in common. *State v. Marion*, 122 N.H. 20, 22 (1982).

█ Furthermore, as the Commission recognized, our definition of "property of another" adopts section 223.0(7) of the Model Penal Code. *See* REPORT OF COMMISSION TO RECOMMEND CODIFICATION OF CRIMINAL LAWS, supra. The relevant commentary to the Model Penal Code explains that this section

> defines "property of another" to include any property "in which any person other than the actor has an interest which the actor is not privileged to infringe." Obviously, this concept includes any ownership or possessory interest of another. . . .
>
> There are circumstances when a person ordinarily considered the owner of property may nevertheless be convicted of theft under Section 223.2. This result follows from the provision in the definition of "property of another" that includes an interest in property held by another "regardless of the fact that the actor also has an interest in the property." Thus, . . . [p]arties to joint bank accounts . . . may be convicted of stealing from each other by unauthorized withdrawals from the account.

MODEL PENAL CODE § 223.2 cmt. 4, at 168-69 (Official Draft and Revised Comments 1980) (footnote omitted).

█ The commentary further explains that, for purposes of the definition of "property of another," the formality of the arrangement between the thief and the owner is immaterial. *Id.* at 168. Instead, what is important is that "the thief sets out to appropriate a property interest beyond any privilege established by the arrangement." *Id.* Thus, to determine whether a person was privileged to appropriate funds in a joint account, and, hence, whether the funds were the property of another, we look to the privilege established by the arrangement. With respect to a joint account, if the arrangement does not provide one owner of the account with a privilege to take funds from the account in the circumstances under which that owner withdrew them, that owner may be convicted of stealing "by unauthorized withdrawals from the account." *Id.* at 169.

Our interpretation is supported by the decisions of other courts examining similar statutory language. *See, e.g., LaParle v. State,* 957 P.2d 330, 333 (Alaska Ct. App. 1998) (holding that money, which was a marital asset, was "property of another," and thus, husband was not privileged to conceal money from wife and committed theft by doing so); *State v. Radzvilowicz,* 703 A.2d 767, 779-80 (Conn. App. Ct. 1997) (holding the co-owner of corporation was not privileged to infringe upon interest of another co-owner); *State v. Gard,* 742 N.W.2d 257, 262 (S.D. 2007) (recognizing that "the law in most states today is that a partner can be found guilty of embezzlement when he misappropriates funds from his partnership").

█ Here, we conclude that the evidence was sufficient to prove that the defendant was not privileged to infringe upon the victim's interest in the funds in the joint account for the defendant's own use. RSA 637:2, IV. The defendant argues that the terms of the account did not require the victim's permission for her to withdraw funds from the account. The fact that the defendant did not need the victim's permission in order to withdraw funds from the account, however, does not mean that the defendant was privileged to appropriate the victim's interest in those funds. Here, the victim testified that the purpose of the joint account was to allow the defendant to better assist her with "big bills." The victim further testified that she never authorized the defendant to make withdrawals from the joint account for her own needs. Accordingly, we conclude that the evidence was sufficient that the funds in the joint account were the "[p]roperty of another."

## II. Theft by Misapplication of Property

The defendant next argues that the evidence was insufficient to convict her of the charges of theft by misapplication of property. These charges

alleged that the defendant, while serving as the victim's financial representative for the purpose of paying her monthly bill at Pleasant View, obtained certain amounts of the victim's money, the value of which was more than $1,000, "but recklessly failed to use the money to pay [Pleasant View] and instead" used it to pay for personal expenses "that did not benefit [the victim], allowing [the victim's] account at [Pleasant View] to fall into arrears."

RSA 637:10, I, provides that a person commits theft by misapplication of property

> if he obtains property from anyone or personal services from an employee upon agreement, or subject to a known legal obligation, to make a specified payment or other disposition to a third person, whether from that property or its proceeds or from his own property to be reserved in an equivalent or agreed amount, if he purposely or recklessly fails to make the required payment or disposition and deals with the property obtained or withheld as his own.

### A. *Legally Obligated*

The defendant first argues that, although she "may have had a moral obligation to help the victim pay her bills," the State failed to prove that she "owed [the victim] a legal obligation as her financial representative to pay her rent at Pleasant View." The State counters that, although "there was no document that, by its terms, technically established that the defendant was serving the victim in a fiduciary capacity," the facts of the case amply demonstrate that "she had the requisite legal obligation to act in [the victim's] best interests in handling funds that were designated for payment to Pleasant View." We agree.

To convict the defendant of theft by misapplication of property, the State had to prove that the defendant obtained property from the victim "upon agreement, or subject to a known legal obligation, to make a specified payment" to Pleasant View. RSA 637:10, I. At trial, the State presented evidence, that for many years, the victim relied upon her long-time accountant to assist her with paying bills. However, in December 2006, as a result of "pressure" from the defendant, the victim terminated that relationship because the defendant intimated that the victim did not need the accountant and that she and the victim could "do that." The victim testified that the defendant had taken over paying her bills and that "[a]ny major bill, she paid out of my money." The victim stated that she believed the defendant to be a good businessperson and characterized her as "one of the brightest women I ever knew."

The State also presented evidence that the defendant had asked Pleasant View to deliver the victim's bills to the defendant, that the defendant had told Pleasant View that she would make sure that the victim's bills would get paid, and, in fact, the defendant had been paying the bills. When the victim fell behind with her rent payments, and after the business office manager repeatedly contacted the defendant, the defendant assured the business office manager that she would make sure that Pleasant View was paid. The defendant told the business office manager that she was working on getting the bills paid, at one point stating that she would pay the bills from her own account. When the business office manager and the executive director finally met with the victim regarding the bills, the victim was "very upset" and did not understand why she was so far behind. Drawing all reasonable inferences in favor of the State, we conclude that there was sufficient evidence to prove that the defendant had an "agreement, or . . . known legal obligation" under RSA 637:10 to pay the victim's rent at Pleasant View. *See* RSA 637:10, I; *State v. Pleasant Hill Health Facility, Inc.*, 496 A.2d 306, 308 (Me. 1985) (nursing home's mishandling of patient's personal use funds constituted theft by misapplication of property).

## B. *Designated Funds*

The defendant next argues that the State failed to prove that "the money specified in the indictments was designated for, and entrusted to [her] to pay, [the victim's] rent." The State disagrees, and contends that there was sufficient evidence to prove that the defendant obtained the proceeds from the sale of the victim's Florida home "subject to delivering them to Pleasant View."

█ At trial, the evidence established that, in late 2008 and early 2009, the defendant received the victim's bills for the rent at Pleasant View and, on occasion, paid the bills. In late 2008, the executive director had a conversation with the victim and the defendant about the victim's bills and the victim informed the executive director that she had put her Florida property on the market and they were waiting for the property to be sold. Following the sale, two payments of $25,000 each were received from the sale proceeds, on November 25, 2008, and March 19, 2009, respectively. The defendant deposited each $25,000 payment into the joint account, but the money was not paid to Pleasant View. Instead, within two weeks of the November 2008 deposit, there were seven withdrawals from the joint account totaling over $22,000, and the funds were used to pay the defendant's creditors. The evidence further shows that within eight days of the March 2009 deposit, there were three withdrawals from the joint account totaling at least $23,000 that were then deposited into the defendant's personal bank account. Viewing all inferences in a light most

favorable to the State, we conclude that a rational jury could have found beyond a reasonable doubt that the evidence excluded all reasonable conclusions except that the proceeds from the sale of the victim's Florida home were designated for, and entrusted to the defendant to pay, the victim's rent at Pleasant View. *Cf. Huffman*, 154 N.H. at 686-87 (evidence sufficient that money designated to pay defendant's father's rent at nursing home was not withdrawn by defendant from his father's account and held by defendant in protest of nursing home's care of his father, but instead was treated by defendant as his own).

Finally, the defendant argues that the $150,014 specified in one of the indictments alleging theft by misapplication of property included the funds from the victim's certificate of deposit, which the victim agreed to use to pay off the defendant's loan at MCSB. Because the victim allowed those funds to be used to pay off the defendant's loan, the defendant asserts that the State failed to prove that the funds specified in the indictment were designated for paying the victim's rent at Pleasant View. At trial, however, the State acknowledged that the certificate of deposit funds were not relevant to the charges alleging theft by misapplication of property, and that the funds referred to in that indictment were derived from the November 2008 proceeds from the sale of the victim's Florida home.

██ ██ Although the indictment alleged that the defendant obtained $150,014 of the victim's money, the value of the property taken affects only the grade of the offense, *see* RSA 637:2, V(b) (2007), and "[t]heft constitutes a class A felony if . . . [t]he value of the property . . . exceeds $1,000," RSA 637:11, I (2007) (amended 2010). *See State v. French*, 146 N.H. 97, 99-100 (2001). Thus, in order to obtain a conviction for a class A felony of theft by misapplication of property, it was necessary for the State to prove, in addition to the other elements set forth in RSA 637:10, I, only that the misapplied property — designated for payment of the victim's rent at Pleasant View — had a value in excess of $1,000. Here, there was sufficient evidence for the jury to find beyond a reasonable doubt that more than $1,000 of the proceeds from the sale of the victim's Florida home were designated for payment of her rent at Pleasant View, and that the defendant instead used the funds as her own. Since that amount clearly exceeds the $1,000 amount that the State was required to prove to support a class A felony conviction, the defendant has failed to show that the evidence was insufficient to prove that she was guilty of the crime charged.

*Affirmed in part; reversed in part; and remanded.*

DALIANIS, C.J., and HICKS, CONBOY and LYNN, JJ., concurred.