NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Hillsborough-northern judicial district
Nos.  2018-0708
      2018-0710

THE STATE OF NEW HAMPSHIRE

v.

JAMES FOLLEY

THE STATE OF NEW HAMPSHIRE

v.

KAREN FOLLEY

Submitted: November 20, 2019
Opinion Issued: January 10, 2020

Gordon J. MacDonald, attorney general (Bryan J. Townsend, II, assistant attorney general, on the brief), for the State.

Law Office of Shepherd & Osborne, of Nashua (Justin C. Shepherd on the brief), for James Folley.

Law Office of Michael J. Zaino, PLLC, of Hampton (Michael J. Zaino on the brief), for Karen Folley.

DONOVAN, J. The defendants, James Folley and his wife, Karen Folley, appeal their convictions following a joint jury trial in the Superior Court (Abramson, J.) on two counts of theft by unauthorized taking as a principal or accomplice, see RSA 637:3 (2016); RSA 626:8 (2016), and, as to James, an additional count of financial exploitation of an elderly adult, see RSA 631:9 (Supp. 2018).[1] They also appeal the trial court's restitution order requiring that they pay restitution to an assisted living facility where the victim resided at the time of the crimes. They argue that: (1) the evidence was insufficient to support their convictions; and (2) the trial court erred by ordering them to pay restitution to the facility because it is not entitled to compensation under RSA 651:62 (2016). We affirm the defendants' convictions but reverse the restitution order because the economic loss claimed by the facility was not a direct result of the defendants' criminal conduct. See RSA 651:62, III.

## I. Facts

The jury could have found the following facts based upon the evidence at trial and the reasonable inferences drawn therefrom. In 2006, James' elderly sister, the victim, executed a durable power of attorney agreement which prospectively authorized James to act as her attorney-in-fact on financial decisions in the event she became unable to make decisions for herself. Thereafter, she moved into an assisted living facility. At this time, the victim had been diagnosed with Parkinson's disease but had no mobility or memory issues.

Until 2011, the victim had sole control over her finances and paid her bills independently. She did not have a debit card and instead paid her bills by check. The majority of the victim's spending was on housing and medical expenses. She also made small expenditures on retail purchases, which consisted mostly of purchases from a gift basket company, and contributed a small amount to charities. On September 28, 2011, the victim added James as a co-owner of her bank account.

In October 2011, when the victim was 77 years old, she moved to another assisted living facility. In her application for admission, she listed assets of $170,000, monthly Social Security and pension income of approximately $1,923, and monthly expenses of approximately $346. When she applied, the facility staff informed her that she was expected to make her assets available for costs associated with living there. During this period of time, neither defendant worked due to health problems.

---

[1] Although the record demonstrates that James was convicted of a third count of theft by unauthorized taking, he makes no argument challenging this conviction, so we do not address it.

The victim moved into a small one-room unit at the facility, at a cost of $4,000 per month, which did not have a kitchen or other amenities. The victim did not drive and could not prepare meals without assistance, and thus relied upon the facility to provide her meals, transportation, and entertainment. She spent her time reading, playing games, and watching television, and she continued to pay for housing and medical expenses by check. She rarely made retail purchases, and when she did, they consisted of used books and sneakers. When the defendants visited the victim, they brought her personal necessities.

Within weeks of being added as a co-owner of the victim's bank account, James obtained a debit card associated with the account. The defendants used the debit card in November 2011 to make a $600 ATM withdrawal. On the same day, $700 was deposited into the defendants' bank account. Between November and December 2011, they also used the debit card to pay for purchases at retail stores totaling approximately $89.

For several months, there were no debit card expenditures from the victim's account. However, in April 2012, James changed the address on the victim's bank account to his own address. Then, in August, when the victim had nearly $140,000 in her account, the defendants engaged in an "explosion in spending" that was "uncharacteristic" of the victim's spending patterns, consisting of debit card purchases and cash withdrawals from the victim's bank account. This spike in spending occurred shortly after the victim had visited her doctor on August 7 to assess concerns about her increased mobility challenges, frequent falls, and decline in short-term memory, which are symptoms associated with Parkinson's disease.

Between August 2012 and September 2013, the defendants used the debit card to purchase thousands of dollars of retail items from local and online stores and to conduct thousands of dollars in ATM withdrawals. These purchases included cookware, pet supplies, groceries, car parts, toys, airplane tickets, and cigarettes. The large majority of items purchased from online retailers — 90 of 93 items purchased from one retailer — were shipped to Karen at the defendants' address. They also used funds to pay for household and personal expenses, such as cable, heating, and mobile phone expenses.

The defendants made numerous cash withdrawals from the victim's account, often withdrawing hundreds of dollars at a time. These withdrawals frequently occurred shortly before the defendants deposited similar amounts of money in their own bank account. Prior to this period, the defendants rarely made such large deposits. In March 2013, James withdrew $50,000 from the victim's account and deposited $47,500 into the defendants' bank accounts and retained the remaining $2,500 in cash. By August 2013, the victim had only $1,342 in her account.

In July 2013, the facility moved the victim into its memory care unit as a result of her frequent falls and increasing memory issues. During this time frame, James began exercising control over the victim's finances under his power of attorney. Due to the defendants' concern about the victim's financial situation, the facility agreed to reduce the cost of the victim's room from $5,400 per month to $3,500 per month. Although the defendants deposited $5,000 into her account in September 2013 and $500 in May 2014, they continued to use funds from her account. Between October 2013 and November 2014, the defendants made an additional withdrawal, with a corresponding deposit into their account, and debit card purchases, totaling $3,080.

In February 2014, James informed the facility that the victim's funds had been depleted. Because the facility did not "want[] to see [the victim] go," it asked James for an amount the victim could reasonably afford to pay. James informed the facility the victim could pay $1,860 per month, based upon her monthly Social Security and pension income, which the facility accepted. In March and September 2015, James made two withdrawals of $812 and $425 respectively, which were deposited into the defendants' checking account.

In April 2015, James applied for Medicaid for the victim through the New Hampshire Department of Health and Human Services (DHHS), with the intent of moving her into a nursing care facility that accepted Medicaid. As part of the application process, a DHHS staff member met with the defendants. The staff member informed them that DHHS would review the victim's financial history for the last five years (lookback period) and asked whether any "red flag[s]" would appear. The defendants informed DHHS that its review would reveal a $50,000 gift from the victim, which James described as an "inheritance," but that the transaction occurred prior to the lookback period.

When DHHS conducted its review, it noticed the high rates of debit card spending and withdrawals beginning in August 2012 that seemed uncharacteristic of the victim's previous financial activity. DHHS provided the defendants with a list of transactions it considered to be "questionable" and requested additional information within 10 days. James sent an e-mail to DHHS, remarking on the number of questions DHHS asked the defendants to answer and noting that the victim handled the money herself until he "took over" in August 2013. After receiving an extension, James explained withdrawals and purchases in mostly general terms, providing only a few specific explanations for certain transactions. He represented that the defendants had made cash withdrawals at the victim's request to give as gifts to the victim's stepchildren and step-grandchildren; that they made grocery store purchases of fruits and candy for "huge" gift baskets that the victim gave to the facility staff; that Karen purchased items to decorate the victim's room at the facility; that the victim wanted "other things" that the facility did not provide for her; and that the victim purchased satellite cable for the defendants

4

as a Christmas gift.  James acknowledged purchases of car parts, but stated only that he "used the debit card," noting that it was "in both names."

DHHS denied the application due, in part, to the defendants' failure to provide sufficient information about the questionable transactions.  Following the denial, James represented to DHHS that he had not received the lookback logs.  Subsequently, DHHS sent the defendants a packet containing them.  The defendants thereafter provided DHHS with transaction-by-transaction explanations for the items listed on the log, but many of their explanations were similar to James' previous representations and did not identify specific items purchased or describe how withdrawn cash was used.[2]  Eventually, DHHS declined to reopen the application.

In January 2016, an investigator with the New Hampshire Bureau of Elderly and Adult Services (BEAS) met with the defendants after receiving a report that they may have financially exploited the victim.  The defendants told the investigator that, once the victim moved into the facility, they met with her once a month to review her finances and ensure that she paid her bills, but that they had had "no real awareness" of her finances until August 2013. When asked, they admitted that they occasionally used some of her money, but not on a routine basis.  James stated that the victim asked him to take her to the bank, initiated a transaction, and gave him a cashier's check for $50,000 as an inheritance, which he used to finish building his automotive garage.  At the time the investigator met with the defendants, the garage had a full stock of tools and parts, a hydraulic car lift, and two "hot rod" cars.  The investigator then met with the defendants a second time.  When questioned about specific transactions from the victim's bank records, they provided vague explanations that withdrawals and purchases were conducted by the victim or at the victim's direction for gifts and various items for herself.

In April 2016, the victim revoked James' power of attorney.  She resided at the facility until her death in 2017.  That year, the defendants were each indicted on two counts of theft by unauthorized taking, with one count pertaining to ATM withdrawals between November 2011 and August 2014 and the other count pertaining to debit card purchases between those same dates. James was also indicted on an additional count of theft by unauthorized taking for the $50,000 withdrawal in March 2013, and one count of financial exploitation of an elderly adult for two ATM withdrawals that occurred between March and September 2015.  Following a joint jury trial, the jury convicted the defendants on each indictment.  As part of their sentence, the State requested that the defendants pay restitution to the facility, in an amount consisting of the difference between the monthly cost of $3,500 that the facility had been charging the victim and the reduced amount that it agreed to charge.  The trial

---

[2] For example, to explain cash withdrawals of $60, $200, and $800, they simply stated, "cash for her."  To explain a $59 purchase, they stated that they "took her for things."

5

court granted this request. Each defendant has appealed, and we have consolidated the cases.

## II. Analysis
### A. Sufficiency of the Evidence

We first address the defendants' challenges to the sufficiency of the evidence. A challenge to the sufficiency of the evidence raises a claim of legal error; therefore, our standard of review is de novo. State v. Leith, 172 N.H. 1, 11 (2019). When considering such a challenge, we objectively review the entire record, including any evidence presented by the defendant, to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, considering all the evidence and all reasonable inferences drawn therefrom in the light most favorable to the State. State v. Saintil-Brown, 172 N.H. 110, 117 (2019). We examine each evidentiary item in the context of all the evidence, and not in isolation. Id.

The defendants have the burden of demonstrating that the evidence was insufficient to prove guilt. Id. When the proof involves both direct and circumstantial evidence, we apply the standard set forth above and uphold a jury's verdict unless no rational trier of fact could have found guilt beyond a reasonable doubt. State v. Woodbury, 172 N.H. 358, 363 (2019). However, we apply a different standard when the evidence is solely circumstantial. Id. Under these circumstances, a defendant challenging sufficiency must establish that the evidence does not exclude all reasonable conclusions except guilt. Saintil-Brown, 172 N.H. at 117. The proper analysis is not whether every possible conclusion consistent with innocence has been excluded, but, rather, whether all reasonable conclusions other than guilt have been excluded. Id.

### 1. Theft by Unauthorized Taking

The defendants first argue that the State introduced insufficient evidence to convict them of the two counts of theft by unauthorized taking pertaining to the ATM withdrawals and purchases. A person is guilty of the crime of theft by unauthorized taking if he or she "obtains or exercises unauthorized control over the property of another with a purpose to deprive him thereof." RSA 637:3, I. Thus, the State was required to prove that the defendants (1) obtained or exercised unauthorized control over (2) the property of another (3) with the purpose to deprive the other of the property. State v. Gagne, 165 N.H. 363, 368 (2013).

The defendants argue that the State failed to introduce sufficient evidence to prove the elements of unauthorized control and property of another. However, as to the element of property of another, the defendants do not dispute that the money in the bank account belonged to the victim. Instead, they rely upon our decision in Gagne, in which we concluded that,

6

where a defendant is a co-owner of a joint bank account, the State must prove that the "arrangement does not provide [the defendant] with a privilege to take funds from the account in the circumstances under which the [defendant] withdrew them" to meet the element of property of another. Id. at 371-72; see RSA 637:2, IV (2016) (defining "property of another," in relevant part, as "property in which any person other than the actor has an interest which the actor is not privileged to infringe, regardless of the fact that the actor also has an interest in the property"). Based upon James' status as co-owner of the joint bank account, the defendants argue that, to prove this element, the State was required, and failed, to introduce sufficient evidence to prove that the defendants did not have the privilege — in the form of authorization from the victim — to withdraw and spend the funds in the account. See Gagne, 165 N.H. at 372. Thus, the defendants present the same challenge to both elements — that the State introduced insufficient evidence to prove that they withdrew and spent the victim's money without authorization.

We agree with the defendants that the State did not introduce direct evidence that they lacked authorization to spend or withdraw the victim's money. However, we disagree with their assertion that the State was required to introduce direct evidence, in the form of the victim's testimony, to meet its burden of proof. We have held that, to prove lack of authorization, circumstantial evidence is sufficient. See State v. Flynn, 144 N.H. 567, 570-71 (1999) (concluding that, where the owner of the stolen item did not testify, circumstantial evidence was sufficient to prove lack of permission); see also State v. Blow, 135 N.H. 640, 641-42 (1992) (concluding that circumstantial evidence was sufficient to prove lack of license or privilege to enter a building). Accordingly, we review the circumstantial evidence to determine whether it was sufficient to exclude all reasonable conclusions other than the conclusion that the defendants did not have authorization to withdraw or spend the victim's money. See Saintil-Brown, 172 N.H. at 117.

Viewed in the light most favorable to the State, we conclude that there was sufficient circumstantial evidence to exclude all other reasonable conclusions. The jury heard evidence of the victim's consistent and frugal spending habits, which consisted almost entirely of housing and medical expenditures, and that she had previously given only small donations to charity and spent a modest amount of money at a gift basket retailer. The jury also heard evidence that the cost of the victim's living arrangements exceeded her monthly income and that the facility informed her before her admission that it expected her to make her assets available to fund her residence there, giving rise to the inference that the victim understood the need to reserve her assets to pay for her living arrangements. The jury then heard evidence demonstrating that the defendants' use of the victim's money was entirely inconsistent with the victim's spending habits and her need to conserve her assets: the defendants spent thousands of dollars on numerous and unnecessary retail items, which could not be used at an assisted living facility

7

by a resident who was unable to cook or perform other basic tasks on her own, and withdrew or spent nearly <u>all</u> of her money, other than the money used to pay for rent or medical expenses, within a single year. These facts negate any reasonable conclusion that the victim authorized the defendants to make these expenditures.

Moreover, the defendants' out-of-court statements provided evidence of their consciousness of guilt. The defendants initially attempted to distance themselves from the matter by representing that they had no involvement in the victim's finances until August 2013, despite their claim that they reviewed the victim's monthly bank statements with her after she moved into the facility in 2011. Then, when confronted with specific transactions by DHHS and the BEAS investigator, they contended that the thousands of dollars in cash withdrawals and purchases were made at the victim's direction to use for herself or as gifts for facility staff and her family.

These explanations, however, squarely contradicted the records of these purchases, including the items listed on receipts, the delivery address of online purchases, and the bank records suggesting that the defendants deposited withdrawn cash from the victim's account into their own accounts. The defendants' explanations of other transactions were inconsistent with the victim's medical records. For example, on at least two occasions when the defendants claimed they took the victim shopping, she had been admitted to the hospital for a head injury or had a significant mobility incident at the facility. Further, the explanations contradicted witness testimony, including testimony from the victim's stepchildren, that the victim never gave them or their children cash or gifts during this period other than holiday cards and an occasional baked good, and testimony from the facility director that the victim never gave staff any gifts, and that such gift-giving violated the facility's policy.

Moreover, other circumstantial evidence provided the reasonable inference that the defendants took advantage of the victim's health issues to conceal their activity from her. Specifically, the jury heard evidence that, a few months after the victim added James' name to her account, he changed the address on the account because of the victim's memory issues. The jury also heard evidence that the victim had visited the doctor due to mobility and cognitive issues shortly before the defendants' spending spree began, and testimony from the defendants demonstrating their awareness of and involvement in the victim's healthcare. Viewing all of this evidence together, the circumstantial evidence excludes any reasonable conclusion other than the conclusion that the defendants lacked authorization to make the withdrawals and purchases.

The defendants argue that the evidence at trial gave rise to an alternative, reasonable conclusion consistent with innocence: that the victim authorized the defendants to use the money because she wanted to repay them

8

for all that they had done for her and help them "in their time of need." This conclusion would require the jury to have credited the defendants' testimony. However, in a sufficiency challenge, where we consider all the evidence and reasonable inferences therefrom in the light most favorable to the State, we "assume[] the jury made all factual findings and credibility determinations necessary to support its verdict." State v. Saunders, 164 N.H. 342, 351-52 (2012) (emphasis omitted); see also Woodbury, 172 N.H. at 364 ("[M]atters such as weighing evidence, determining witness credibility, and resolving conflicts in witness testimony are left to the jury."). Here, "assuming all credibility resolutions in favor of the State," we conclude that the alternative explanation suggested by the defendants cannot be reasonably drawn from the evidence presented at trial. Saunders, 164 N.H. at 351. Indeed, this alternative conclusion would require the fact finder to conclude that the victim, who needed to conserve her assets to pay for her living arrangements and medical expenses for the foreseeable future, willingly depleted those assets by gifting the defendants tens of thousands of dollars for the purpose of helping them during a time of financial hardship. Based upon the evidence, such a conclusion is not reasonable.

## 2. Financial Exploitation of an Elderly Adult

James also challenges the sufficiency of the evidence used to convict him of financial exploitation of an elderly adult for making two withdrawals from the victim's account under the power of attorney. In challenging the sufficiency of the evidence of this offense, James relies upon the same argument he proffers in challenging his convictions for theft by unauthorized taking — that the State failed to introduce direct evidence, in the form of the victim's testimony, to prove that his act of withdrawing funds from the victim's account was unauthorized. However, to prove the crime of financial exploitation of an elderly adult, the State was not required to prove that James took funds without authorization from the victim; it was required to prove that James took funds, in breach of a fiduciary duty, without authorization from the instrument establishing that fiduciary duty — the power of attorney. See RSA 631:9, I(a)(2).

As an initial matter, we note that the power of attorney itself does not appear in the record before us. Accordingly, we rely upon the portions of the power of attorney that were read into the record by a witness at trial. According to the power of attorney, James had the authority to make decisions regarding the victim's money and spend the money on her behalf. However, it placed James under a fiduciary duty to make such financial decisions in a way that is "reasonable in view of the interests of the [victim] and in view of the way in which a person of ordinary judgment would act in carrying out that person's own affairs." Further, the power of attorney prohibited James from "us[ing] the money or property for [his] own benefit or to make gifts to [him]self or others."

9

The State did not introduce direct evidence to demonstrate that James conducted the two withdrawals for his own benefit rather than for the benefit of the victim. However, we conclude that the State introduced sufficient circumstantial evidence to exclude all reasonable conclusions to the contrary. The evidence presented at trial establishes that James withdrew $812 on March 4, 2015, and $425 on September 21, and that there was a corresponding deposit into the defendants' checking account. The evidence also shows that these withdrawals occurred well after the defendants depleted nearly all of the victim's funds. This evidence, viewed together with the evidence that the defendants typically did not deposit large sums of cash in their own accounts prior to November 2011, was sufficient to exclude any reasonable conclusion except that James withdrew the money for his own benefit, which was not reasonable in view of the interests of the victim. Therefore, the State introduced sufficient evidence to prove that James was not authorized by the power of attorney to make the two withdrawals.

## B. Restitution

The defendants next challenge the trial court's restitution order. "Any offender may be sentenced to make restitution in an amount determined by the court." RSA 651:63, I (Supp. 2018). Determining the appropriate restitution amount under RSA 651:63, I, is within the discretion of the trial court. State v. Schwartz, 160 N.H. 68, 71 (2010). If the factual basis for restitution is disputed, however, the State must prove by a preponderance of the evidence that the loss or damage is causally connected to the offense and bears a significant relationship to the offense. Id. In reviewing the trial court's ruling, we accept its factual findings unless they lack support in the record or are clearly erroneous. Id. Our review of the trial court's legal conclusions is de novo. Id.

The trial court ordered James to pay $81,890.83 in restitution to the facility, based upon the total amount of money, according to the State, that the facility "would have" received if it had continued to charge the victim $3,500 per month rather than the reduced cost the facility agreed to accept. The trial court ordered Karen to share, jointly and severally, $44,293.27 of that obligation with James. The defendants argue that the facility is not entitled to receive restitution under RSA 651:63. Specifically, they argue that the facility is not a "victim" as defined by RSA 651:62, VI, because it did not suffer an economic loss as a result of the defendants' conduct. See RSA 651:62, VI. The State argues that the facility suffered an economic loss — in the form of lost revenue — when it agreed to reduce the victim's monthly rent due to her inability to pay the full $3,500 — an inability that resulted from the defendants' conduct.

Resolution of this issue requires us to engage in statutory interpretation. Accordingly, our review is de novo. State v. Pinault, 168 N.H. 28, 31 (2015). In

10

matters of statutory interpretation, we are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. Id. We construe provisions of the Criminal Code according to the fair import of their terms and to promote justice. Id. We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. Id. Further, we interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language it did not see fit to include. Id. Finally, we interpret a statute in the context of the overall statutory scheme and not in isolation. Id.

The statute defines "restitution" as "money or service provided by the offender to compensate a victim for economic loss." RSA 651:62, V. Thus, a party must be a "victim" to receive compensation from an offender under the statute. See id. The statute defines "victim" as "a person or claimant who suffers economic loss as a result of an offender's criminal conduct." RSA 651:62, VI. "Economic loss" is defined as "out-of-pocket losses or other expenses incurred as a direct result of a criminal offense." RSA 651:62, III. Thus, for a party to fall within the definition of "victim," the party must suffer an out-of-pocket loss or incur expenses as a direct result of a criminal offense. See id.

The phrase "direct result" is not defined in the statute or elsewhere in the Criminal Code. In State v. Armstrong, 151 N.H. 686 (2005), we declined to adopt a test to "ascertain at what point an event is no longer a direct result of a crime." Armstrong, 151 N.H. at 687-88 (holding that reasonable medical expenses to treat injuries suffered by a police officer when attempting to apprehend the defendant, who was convicted of the crime of escape, were a direct result of the escape). We simply noted "that a defendant may be held liable for economic losses directly resulting from the factual allegations that support the conduct covered by the conviction." Id. at 687. Similarly, in Pinault, we also declined to adopt a test to determine "the outer limits of the connection that must exist" between the harm or loss and criminal conduct to support a restitution order, concluding that the damage at issue was not a result of the crime for which the defendant was convicted. Pinault, 168 N.H. at 32-33 (holding that damage to a mailbox caused by the defendant's vehicle was not the direct result of the defendant's act of leaving the scene of the accident, the basis of her conviction). However, similar to our observation in Armstrong, we noted that the plain language of the statute "clearly and unambiguously requires a causal connection between the criminal act and the economic loss or damage." Id. at 32.

As in Armstrong and Pinault, we need not adopt a test to determine the exact scope of the connection between the economic loss and criminal conduct required to support a restitution award, because the facts of this case demonstrate that any lost revenue incurred by the facility was not a direct result of the defendants' criminal acts. "Direct" is defined as "proceeding from

11

one point to another in time or space without deviation or interruption" or "stemming immediately from a source." Webster's Third New International Dictionary 640 (unabridged ed. 2002). Here, the defendants were convicted of utilizing a debit card linked to the victim's bank account to make unauthorized cash withdrawals and purchases for the purpose of depriving the victim of the money used in the withdrawals and purchases. See RSA 631:9; RSA 637:3, I. Based upon the plain language of the restitution statute, the economic loss directly resulting from this criminal conduct is the victim's loss of her assets, not the revenue the facility could have generated if it did not decide to reduce the victim's rent. Although the facility made this decision after learning of the victim's financial situation, this decision was, at most, a collateral consequence of the defendants' criminal conduct, which is not compensable under the restitution statute. See RSA 651:62, III, VI. Accordingly, we hold that the revenue the facility would have made if it had not decided to reduce the victim's rent does not constitute an economic loss incurred as a direct result of the defendants' criminal offense.

The State argues that our interpretation of the statute does not promote justice. It argues that parties like the facility, which suffered an economic loss because it "placed [the victim]'s needs first" by allowing her to stay at the facility at a reduced rate, should be entitled to compensation. We recognize that the facility agreed to accept less money from the victim so that she could continue to reside there. However, we cannot ignore the plain language of the statute that limits the class of victims who may be compensated to those who suffer an economic loss as a direct result of a criminal offense. See RSA 651:62, III. Were we to adopt the State's interpretation of the statute, we would expand the class of victims that could be compensated far beyond that intended by the legislature. We express no opinion as to whether the facility may have any other remedies available to recover the losses it alleges.

## III. Conclusion

Because the State introduced sufficient circumstantial evidence to exclude all reasonable conclusions other than guilt, we affirm the defendants' convictions. We reverse the trial court's restitution award to the assisted living facility because any economic loss incurred by the facility was not a direct result of the defendants' criminal conduct. Any issues that the defendants raised in their notices of appeal, but did not brief, are deemed waived. State v. Bazinet, 170 N.H. 680, 688 (2018).

Affirmed in part and reversed in part.

HICKS, BASSETT, and HANTZ MARCONI, JJ., concurred.

12