NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Carroll
No. 2018-0336

STATE OF NEW HAMPSHIRE

v.

ELIZABETH SEIBEL

Argued: April 14, 2021
Opinion Issued: September 22, 2021

Gordon J. MacDonald, attorney general (Brandon H. Garod, senior assistant attorney general, on the brief and orally), for the State.

Thomas Barnard, senior assistant appellate defender, of Concord, on the brief and orally, for the defendant.

DONOVAN, J. The defendant, Elizabeth Seibel, appeals her convictions, following a bench trial in the Superior Court (Ignatius, J.), on one count of financial exploitation of an elderly person, see RSA 631:9, I(a)(2) (2016), and two counts of theft by unauthorized taking, see RSA 637:3 (2016). She challenges the sufficiency of the evidence on all three convictions. Because the State presented sufficient evidence to support each of the defendant's convictions, we affirm.

I. Facts

The trial court found or could have found the following facts. The victim is an elderly widow and the defendant's mother-in-law. In November 2012, the victim and her husband moved to New Hampshire to be close to their son and his wife, the defendant. About one month later, the victim's husband died. At that time, the victim had about $11,300 in her personal checking account and owned four certificates of deposit (CDs) totaling about $110,000. She also received approximately $3,500 each month in social security, pension, and annuity payments. The victim had concerns about whether these financial resources were sufficient to support her for the rest of her life.

Shortly after her husband's death, the victim opened another checking account (Account #1), into which she deposited thousands of dollars. The victim also executed a durable general power of attorney granting her son authority to act on her behalf and authorizing the defendant to act as her agent if her son became "unavailable or unable" to do so.

In January 2013, the defendant and the son added their names to Account #1 without the victim's knowledge or consent. When the victim discovered the arrangement, the defendant and the son told her that co-owning the account would make it "easier to pay the bills." Although the victim believed that the defendant and the son were contributing money to the account, neither did so. In February 2013, the victim, with the assistance of the defendant, redeemed one of her CDs to pay her husband's funeral expenses.

In March 2013, the victim moved into a condominium that was closer to the defendant and the son, with whom she regularly visited. The victim lived independently, paying her own bills and shopping for herself. She enjoyed living in her condominium, but was concerned about her ability to afford it.

In October 2013, the defendant began transferring money online from Account #1 to her own personal checking account. Between October 2013 and May 2014, the defendant transferred $12,000 from Account #1 to her own account in separate online transactions of $1,000 or $2,000. The victim did not authorize any of these online transfers and, at the time, she was unaware that they had occurred.

In March 2014, the defendant and the son informed the victim that they planned to purchase a house in Conway and asked her to move in with them and pay rent equal to the monthly amount she paid for her condominium. The victim visited the house with the defendant and the son, but was unimpressed. Afterwards, she told them that she believed the house needed

2

too much work and would cost too much in renovations.  Despite these concerns, the victim agreed to move into the house, believing that her rental payments would help the defendant and the son.

Shortly thereafter, the defendant and the son asked the victim to sign various documents without giving her an opportunity to review them, including a special power of attorney (SPOA) granting the defendant authority to purchase the house on the victim's behalf.  The victim was unaware that she had authorized the defendant to purchase the house on her behalf.  She had no interest in the Conway house and never agreed to purchase it with her own money.

As of May 2014, the defendant had redeemed each of the victim's three remaining CDs, without the victim's knowledge or consent, and transferred the proceeds into Account #1.  In early May 2014, the defendant and the son opened another joint account (Account #2) without the victim's knowledge or consent, naming themselves and the victim as co-owners.  The defendant then began transferring money from Account #1 to Account #2.  Throughout its existence, the only source of funds deposited into Account #2 was Account #1, which, as previously noted, held the victim's money.  The only debit card associated with Account #2 was issued in the defendant's name.

In late May 2014, the closing for the Conway house took place.  The defendant attended without the victim and used her authority under the SPOA to execute legal documents obligating the victim, then eighty-four years old, to a thirty-year mortgage.  The victim was unaware that the defendant had purchased the house on her behalf.

In June 2014, all of the parties moved into the Conway house.  The defendant then began spending money from Account #2 to pay for various personal and household expenses.  In total, and unbeknownst to the victim, the defendant issued approximately $42,000 in checks and made approximately $33,000 in debit purchases from Account #2.  The defendant used some of the funds in Account #2 to renovate and furnish the house.  The defendant also spent some of the funds on goods and services that were personal to her, such as her hairstylist and her personal credit card and cell phone bills.  In all, after January 2015, the defendant spent approximately $2,762 on expenses that were unrelated to the Conway house.  As of May 2015, the victim's financial resources were essentially depleted.

Although the victim had agreed to share some household expenses with the defendant and the son, she never authorized the defendant's use of the money in Account #2.  The defendant's use of this money was also "radically different" from the victim's personal spending habits.  The victim "made regular payments every month with checks [from Account #1] . . . to a small number of vendors with regular recurring identities" and was "very careful in writing down

3

what the reason for the payments were." By contrast, the defendant's expenditures from Account #2 included payments to a wide variety of vendors for goods and services that the victim did not normally purchase.

The defendant's transfers from Account #1 also differed from the victim's spending habits. Whenever the victim gave the defendant or the son money or reimbursed them for certain expenses, she issued checks to them or gave them cash. The victim tended to make such gifts and reimbursements in precise amounts, at irregular intervals, and for specific reasons, which she often detailed on the checks that she issued. She did not transfer money between accounts online, as she generally did not use computers and was unfamiliar with online banking. By contrast, the defendant's transfers from Account #1 to her own personal account were made at consistent intervals, in "broad . . . and very general" amounts of $1,000 and $2,000, which did not appear to correspond to any particular expense incurred by the victim.

While the victim resided in the Conway house, the defendant and the son prevented her from examining her bank statements. On one occasion, they showed the victim one statement, but due to their resistance, the victim never asked again. The victim was also told that the defendant and the son cashed her remaining CDs to settle a lawsuit on the victim's behalf when, in fact, no such lawsuit had ever been brought against her.

In June 2015, the victim contacted an attorney after discovering that she owned the Conway house. Following a police investigation, the defendant was charged with one count of theft by unauthorized taking in connection with money totaling more than $1,500 that the defendant transferred from Account #1 to her own account between October 2013 and May 2014; one count of theft by unauthorized taking relating to purchases totaling more than $1,500 that the defendant made from Account #2 between May 2014 and June 2015; and one count of financial exploitation of an elderly person with respect to purchases totaling more than $1,500 from Account #2 after January 1, 2015.

After the State rested, and again at the close of the evidence, the defendant moved to dismiss the charges, arguing that the evidence was insufficient to convict her. The trial court denied the motions and convicted the defendant on all three counts. The trial court likewise denied the defendant's post-trial motion to set aside the verdicts. This appeal followed.

## II. Analysis

On appeal, the defendant challenges the sufficiency of the evidence on all three of her convictions. A challenge to the sufficiency of the evidence raises a question of law, which we review de novo. State v. Saintil-Brown, 172 N.H. 110, 117 (2019). When considering such challenges, we objectively review the entire record to determine whether any rational trier of fact could have found

4

guilt beyond a reasonable doubt, considering the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the State. Id. We examine each item of evidence in the context of the entire case, and not in isolation. Id. The trier of fact may draw reasonable inferences from facts proved as well as from facts found as the result of other inferences, provided they can be reasonably drawn therefrom. Id. Because the defendant chose to present a case, we review the entire trial record to determine the sufficiency of the evidence. Id. The defendant bears the burden of proving that the evidence was insufficient to prove guilt. Id.

If the evidence presented at trial consists of both direct and circumstantial evidence, we apply the standard set forth above and uphold the verdict unless no rational trier of fact could have found guilt beyond a reasonable doubt. Id. If, however, the record contains only circumstantial evidence, the defendant must establish that the evidence fails to exclude all reasonable conclusions except guilt. Id. The proper analysis is not whether the evidence excludes every possible conclusion consistent with innocence, but whether it has excluded all reasonable conclusions other than guilt. Id. We do not determine whether the defendant has suggested another possible hypothesis that could explain the events in an exculpatory fashion. State v. Roy, 167 N.H. 276, 292 (2015). Rather, we evaluate the evidence in the light most favorable to the State and determine whether the alternative hypothesis is sufficiently reasonable that a rational trier of fact could not have found proof of guilt beyond a reasonable doubt. Id. "[W]here solely circumstantial evidence is at issue, the critical question is whether, even assuming all credibility resolutions in favor of the State, the inferential chain of circumstances is of sufficient strength that guilt is the sole rational conclusion." State v. Ruiz, 170 N.H. 553, 569 (2018) (quotation and emphasis omitted).

A. Financial Exploitation

We first address the defendant's argument that the evidence was insufficient to support her financial exploitation of an elderly person conviction. The defendant was charged with violating RSA 631:9, I(a)(2), which states, in relevant part:

> I. Whoever commits any of the following acts against an elderly, disabled, or impaired adult, . . . shall be guilty of financial exploitation . . . if:
>
> (a) In breach of a fiduciary obligation recognized in law, including pertinent regulations, contractual obligations, documented consent by a competent person, including, but not limited to, an agent under a durable power of attorney, guardian, conservator, or trustee, a person, knowingly or recklessly, for his or her own profit or advantage:

. . . .

> (2) <u>Unless authorized by the instrument establishing</u>
> <u>fiduciary obligation</u>, deprives, uses, manages, or takes either
> temporarily or permanently the real or personal property or
> other financial resources of the elderly, disabled, or impaired
> adult for the benefit of someone other than the elderly,
> disabled, or impaired adult.

RSA 631:9, I(a)(2) (emphases added).

The defendant argues that, in order to prove that she breached a fiduciary obligation, as required by RSA 631:9, I(a)(2), the State had to prove that she exercised a fiduciary power or acted in a fiduciary capacity after January 1, 2015, when RSA 631:9 took effect. The defendant contends that the State failed to meet this burden because it presented no evidence that she exercised a fiduciary power or acted in a fiduciary capacity after May 2014, when the Conway house was purchased. Specifically, the defendant asserts that because she co-owned Account #2 with the victim and the son, she was authorized to make purchases from that account in her capacity as co-owner of the account without exercising any fiduciary power under the SPOA.

Resolving the defendant's argument requires that we interpret the language of RSA 631:9, I(a)(2). The interpretation of a statute raises a question of law, which we review <u>de novo</u>. See <u>State v. Pinault</u>, 168 N.H. 28, 31 (2015). In matters of statutory interpretation, we are the final arbiters of the intent of the legislature as expressed in the words of the statute considered as a whole. <u>Id</u>. We construe provisions of the Criminal Code according to the fair import of their terms and to promote justice. <u>Id</u>. We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. <u>Id</u>. We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. <u>Id</u>. We interpret statutes in the context of the overall statutory scheme and not in isolation. <u>Id</u>.

We disagree with the defendant's argument that, in order to prove that she breached a fiduciary obligation, the State had to prove that she acted in a fiduciary capacity or exercised a fiduciary power after January 1, 2015. As an initial matter, we observe that nothing in the plain language of the statute supports such an interpretation of the State's burden of proof. In order to convict the defendant under RSA 631:9, I(a)(2), the State was required to prove, as relevant here, that the defendant acted "[i]n breach of a fiduciary obligation recognized in law" and that the defendant's actions were not "authorized by the instrument establishing [the] fiduciary obligation." RSA 631:9, I(a)(2).

6

In State v. Folley, 172 N.H. 760 (2020), we upheld the financial exploitation conviction of a defendant who — similar to the defendant here — was accused of breaching a fiduciary obligation under the victim's durable power of attorney by spending money for his own benefit from a joint account that he owned with the victim. Folley, 172 N.H. at 762-66, 770-71. There, the defendant argued that the evidence was insufficient to support his conviction because the State failed to prove that he acted without the victim's authorization. Id. at 770. We rejected this argument, explaining that "the State was not required to prove that [the defendant] took funds without authorization from the victim; it was required to prove that [the defendant] took funds, in breach of a fiduciary duty, without authorization from the instrument establishing that fiduciary duty — the power of attorney." Id. We further observed that, although the power of attorney allowed the defendant to spend the victim's money on her behalf, it "placed [the defendant] under a fiduciary duty to make such financial decisions in a way that [was] 'reasonable in view of the interests of the victim and in view of the way in which a person of ordinary judgment would act in carrying out that person's own affairs'" and prohibited him from "'using the money or property for his own benefit or to make gifts to himself or others.'" Id. (brackets omitted).

Because the defendant in Folley did not dispute that he acted pursuant to the victim's durable power of attorney when he spent money from the joint account, we had no occasion to consider the question presented here — whether a defendant, serving as an agent under a power of attorney, can be liable for a breach of a fiduciary obligation, as required by RSA 631:9, I(a)(2), when purporting to act in his or her individual capacity as co-owner of a joint bank account. See id. at 770-71. To the extent that the defendant here argues that RSA 631:9, I(a)(2) requires proof in every case that the defendant acted in a fiduciary capacity, we disagree. RSA 631:9, I(a)(2) requires the State to prove, as relevant here, that the defendant acted "[i]n breach of a fiduciary obligation recognized in law." When determining whether a defendant breached a fiduciary obligation, we look to the nature and scope of the fiduciary relationship as informed by the terms of the instrument creating that relationship. See id. (relying upon the language of the durable power of attorney to determine whether the defendant breached his fiduciary obligations to the victim); see also Restatement (Third) of Agency § 8.01 cmt. c at 254 (2006) (explaining that "an agent's fiduciary duties to the principal vary depending on the parties' agreement and the scope of the parties' relationship"). Thus, in order to determine whether the defendant here breached a fiduciary obligation, we look to the language of the SPOA.

The SPOA authorized the defendant "to do anything whatsoever that [the victim] may or could do in person, with regard to [the victim's] purchase of [the Conway] property." The SPOA provided that, as the victim's attorney-in-fact, the defendant had authority "to make decisions about the money, property or both belonging to the [victim] and to spend the [victim's] money, property or

7

both on [the victim's] behalf in accordance with the terms of [the SPOA]." Similar to the language of the durable power of attorney in Folley, the SPOA also placed the defendant "under a duty (called a 'fiduciary duty') to observe the standards observed by a prudent person dealing with the property of another" and prohibited her from using the victim's "money or property for [her] own benefit or to make gifts to [her]self or others" unless the SPOA specifically authorized her to do so. The SPOA did not include any language suggesting that, under certain circumstances, the defendant could spend the victim's money for her own personal benefit. Thus, under the terms of the SPOA, it made no difference whether the defendant acted in a fiduciary capacity or in her capacity as co-owner of Account #2; any use of the victim's money for her own personal benefit was contrary to her fiduciary obligation established by the SPOA. We therefore conclude that the State's burden was limited to proving that the defendant breached a fiduciary obligation imposed by the SPOA when she used the victim's money for her own benefit. See RSA 631:9, I(a)(2).

The defendant argues, however, that "[i]n light of the fact that [under Folley] a defendant can violate RSA 631:9, I(a)(2) [by] engaging in conduct that the victim authorized, it would produce absurd results to hold that the provision can also apply to acts that do not involve the exercise of fiduciary powers." In essence, the defendant asserts that any individual in a fiduciary relationship with an elderly person would be prohibited from accepting gifts from the elderly person unless the instrument creating the fiduciary relationship allowed the fiduciary to use the elderly person's property for his or her own benefit. It would make no difference, the defendant posits, that the elderly person independently authorized the gift or the fiduciary exercised no fiduciary power in accepting it. This, the defendant asserts, would produce absurd results.

We reject the premise of the defendant's argument that our decision in Folley precludes a defendant from raising the victim's authorization or consent as a defense to a violation of RSA 631:9, I(a)(2). In Folley, we held that, in order to establish that the defendant breached a fiduciary obligation under RSA 631:9, I(a)(2), the State need not prove that the defendant lacked authorization from the victim. See Folley, 172 N.H. at 770. We did not hold, however, as the defendant asserts here, that "the victim's authorization [is] irrelevant to a charge under RSA 631:9, I(a)(2)." Consent remains a viable defense under the statute, provided that the defendant did not know, or have a reason to know, that the elderly, disabled, or impaired adult lacked capacity to consent. See RSA 631:9, IV (2016); see also RSA 626:6, I (2016).

The defendant also argues that construing RSA 631:9, I(a)(2) in this manner implicates double jeopardy concerns, as it leaves "little to distinguish [RSA 631:9, I(a)(2)] from the crime of theft by unauthorized taking under RSA 637:3." Whether two offenses constitute the same crime for double jeopardy

purposes depends upon "whether proof of the elements of the crimes as charged will require a difference in evidence." State v. Ramsey, 166 N.H. 45, 51 (2014); see also Blockburger v. United States, 284 U.S. 299, 304 (1932) (holding that, under the Federal Constitution, two offenses are not the same if "each provision requires proof of a fact which the other does not"). The defendant argues that RSA 631:9, I(a)(2) must require proof that the defendant acted in her fiduciary capacity because, otherwise, "both crimes would require proof that [the] defendant used the victim's property without the victim's authorization," thereby rendering them the same offense for double jeopardy purposes.

We are not persuaded by the defendant's double jeopardy argument. Whereas RSA 631:9, I(a)(2) requires proof that the defendant acted "[i]n breach of a fiduciary obligation recognized in law," RSA 637:3, I, provides only that "[a] person commits theft if he obtains or exercises unauthorized control over the property of another with a purpose to deprive him thereof." Moreover, unlike RSA 637:3, I, RSA 631:9, I(a)(2) does not require proof that the defendant acted without the victim's authorization. See Folley, 172 N.H. at 770.

In light of our conclusion that the State was required to prove only that the defendant violated a fiduciary obligation when she spent money from Account #2, we further conclude that the evidence was sufficient to establish that, after January 1, 2015, the defendant breached her fiduciary obligation under the SPOA by spending the victim's money for her own personal benefit. Although the defendant purchased the Conway house on the victim's behalf in May 2014, before RSA 631:9, I(a)(2) took effect, the SPOA's broad language indicates that the defendant's fiduciary obligations continued after the purchase of the property. In addition to authorizing the defendant to purchase the property on the victim's behalf, the SPOA granted the defendant authority to, among other things, "bargain, sell, convey, lease, mortgage or discharge" the Conway house and "do any and all things, whether herein enumerated or not, which [the defendant] shall consider advantageous or proper in connection with [the victim's] affairs concerning [the Conway house]." The SPOA provided that this additional, specified authority was not intended to "limit[] the generality of the [defendant's] foregoing broad power." The SPOA further stated that the defendant's authority to act under the SPOA "will end when the [victim] dies." Based upon this language, we conclude that the defendant's fiduciary obligations did not expire with the purchase of the property.[1]

Moreover, a rational trier of fact could have found that, during her fiduciary relationship with the victim, the defendant spent the victim's money for her own benefit and to make gifts to herself, in violation of her fiduciary obligations under the SPOA. Specifically, a rational trier of fact could have

---

[1] Indeed, the defendant conceded at trial that the SPOA did not expire upon the purchase of the Conway house.

9

found that, after January 1, 2015, the defendant spent approximately $2,762 from Account #2 on expenses that were unrelated to the Conway house. These expenses included payments for goods and services that were personal to the defendant, such as the defendant's hairstylist and credit card and cell phone bills. The defendant does not dispute that the money in Account #2 belonged solely to the victim. Nor does she dispute that the victim never consented to her use of the money in Account #2. Cf. State v. Gagne, 165 N.H. 363, 370-72 (2013) (concluding that funds in a joint account owned by the defendant and the victim constituted "property of another," as defined by RSA 637:2, IV, when the arrangement between the defendant and the victim did not privilege the defendant "to infringe upon the victim's interest in the funds in the joint account for [her] own use" (quotation omitted)). Therefore, even assuming that the defendant acted in her individual capacity as co-owner of Account #2 when she spent money from that account, a rational trier of fact could have nonetheless found, beyond a reasonable doubt, that she violated her fiduciary obligations under the SPOA by using the victim's money for her own personal benefit. Accordingly, because the evidence was sufficient for a rational trier of fact to find that the defendant breached a fiduciary obligation, the defendant has failed to meet her burden of establishing that the evidence was insufficient to support her conviction under RSA 631:9, I(a)(2). See Roy, 167 N.H. at 292.

## B. Theft by Unauthorized Taking

We next address the defendant's argument that the evidence was insufficient to support either of her theft by unauthorized taking convictions. A person is guilty of theft by unauthorized taking if he or she "obtains or exercises unauthorized control over the property of another with a purpose to deprive him thereof." RSA 637:3, I. The defendant argues that the evidence was insufficient to prove that she knew her actions were unauthorized. Specifically, she asserts that the evidence was insufficient to exclude the possibility that the son deceived her into believing that the victim authorized her to transfer money from Account #1 to her own personal checking account and to spend money from Account #2 on certain purchases.

For the purposes of this appeal, we assume, without deciding, that RSA 637:3, I, requires the State to prove that the defendant knew her actions were unauthorized. We also assume, without deciding, that the evidence of the defendant's knowledge was wholly circumstantial. Nonetheless, we conclude that the defendant's alternative explanation — that she believed the victim authorized her to transfer $12,000 from Account #1 to her personal account and to spend money from Account #2 on purchases that benefited her alone — is not sufficiently reasonable to prevent a rational trier of fact from finding proof of guilt beyond a reasonable doubt. Roy, 167 N.H. at 292. The totality of the evidence, viewed in the light most favorable to the State, fails to support a reasonable conclusion that the defendant did not know that her actions were unauthorized.

Viewing the evidence and its inferences in the light most favorable to the State, a rational trier of fact could have found that the defendant concealed her conduct from the victim by preventing the victim from examining her bank statements and lying to the victim about using the CDs to settle a fictitious lawsuit.  A rational trier of fact could have therefore found that the defendant's deceptive behavior evidenced her consciousness of guilt, and, thus, her knowledge that the transfers and expenditures were unauthorized.  See Folley, 172 N.H. at 768-69 (concluding that the defendants' out-of-court statements evidenced their consciousness of guilt where their statements were "squarely contradicted" by certain records).

A rational trier of fact could have also found that the victim was of relatively limited means and was concerned about having sufficient resources to support her in the future.  Because the defendant occasionally assisted the victim with her finances and co-owned both Account #1 and Account #2, a rational trier of fact could have found that the defendant was aware of the victim's financial limitations.  Yet, the defendant depleted nearly all of the victim's financial resources in order to pay for things in which the victim expressed no interest.  Based upon this evidence, a rational trier of fact could have inferred that the defendant knew her actions were unauthorized.

Moreover, a rational trier of fact could have found that the defendant's use of the victim's money was markedly different from how the victim normally spent her money.  The expenditures from Account #2 included payments to a wide variety of vendors for goods and services on which the victim did not normally spend money, and the transfers from Account #1 to the defendant's personal account were made at regular intervals and in amounts that did not correspond to any particular expense incurred by the victim.  Because the defendant, as co-owner of both accounts, had access to the victim's billing statements, a rational trier of fact could have found that the defendant knew the purchases and transfers at issue were inconsistent with how the victim normally spent her money.

Accordingly, viewing the evidence in the light most favorable to the State, we conclude that the defendant's proposed alternative conclusion — that she believed the victim, an elderly widow with limited financial resources, authorized her to transfer $12,000 from Account #1 to her personal account and spend money from Account #2 to pay for things in which the victim showed no interest and for which she received no benefit — is not sufficiently reasonable to prevent a rational trier of fact from finding proof of guilt beyond a reasonable doubt.  Roy, 167 N.H. at 292.  The defendant has therefore failed to meet her burden of establishing that the evidence was insufficient to support her theft by unauthorized taking convictions.  See id.

III. <u>Conclusion</u>

For the foregoing reasons, we affirm the defendant's convictions on one count of financial exploitation of an elderly person, <u>see</u> RSA 631:9, I(a)(2), and two counts of theft by unauthorized taking, <u>see</u> RSA 637:3.  Any issues that the defendant raised in her notice of appeal, but did not brief, are deemed waived.  <u>State v. Bazinet</u>, 170 N.H. 680, 688 (2018).

<u>Affirmed</u>.


HICKS, BASSETT, and HANTZ MARCONI, JJ., concurred.